## BUCK WILKERSON v. THE STATE.

*No. 7871.  Decided June 22.*

1. **Practice — Bills of Exception.** — A bill of exception should set forth the objections interposed to the admission of evidence, and objections not affirmatively presented will be deemed to have been waived.

2. **Same.** — Bills of exception should recite facts which would enable this court to understand and know all the details necessary to be known in order to determine the correctness or error of the ruling of the trial court to which the objection is sought to be urged.

3. **Same — Res Gestæ.** — Where defendant's bill of exceptions showed that the State was permitted to prove that immediately after killing his wife, and

within forty steps of her dead body, he also shot and killed another party, *held*, that while the bill of exceptions was too indefinite and defective to authorize its consideration by this court, still the evidence was clearly admissible and properly admitted as res gestæ.

**4. Same—Evidence.**—The State was permitted to prove by a female witness that, some two weeks before defendant killed his wife, she and defendant went off together and were traveling together until arrested and brought back. *Held*, that while the bill of exceptions, as to this matter, did not properly present it, still the evidence was clearly legitimate and admissible as pertinent to the questions of malice and motive.

**5. Murder of the First Degree.**— See a statement of facts held amply sufficient to sustain a verdict and judgment for murder in the first degree with the death penalty assessed.

APPEAL from the District Court of Bell. Tried below before Hon. W. A. BLACKBURN.

Appellant was charged by indictment with the murder of his wife, Susan Wilkerson, and at his trial was convicted of murder in the first degree, and his punishment assessed at death. As fully explanatory of all the facts necessary to be known concerning the case, we deem it only necessary to give the testimony of Jeraleen Harrison, who was a witness for the State, and whose testimony fully explains the causes which brought about the killing. In all important particulars, as to the facts and circumstances immediately attendant upon the killing, her testimony was fully corroborated by the other witnesses in the case.

Jeraleen Harrison, sworn for the State, said: I am now 14 years of age. The defendant, Buck Wilkerson, is my stepfather. He and my mother have been married four or five years. My mother, Susan Wilkerson, is now dead. She died on the night of July 21, 1891. She died from the effects of a gunshot wound in the right side of her head and face. At the time she was killed she was sitting in a rocking chair, on a little narrow porch on the east side of the house, and by the north side of the door. It was very narrow—just wide enough for one to sit in a chair on. She was right against the north side of the door leading into the room. I was lying across the foot of the bed, just inside of the door. I was not asleep. I had just laid down. Just as the gun fired, I jumped to my mother, and the defendant was standing in the yard, with the gun smoking, and pointed at mother. Uncle Primus Crawford hallooed at him, and asked him what was he doing there with that gun, and defendant said, "If you all come out I will kill every one of you." Defendant came up to the steps of the little gallery, and I was standing by mother. He caught me by the right arm with his left hand, and jerked me off the gallery, and started off north with me. He dragged me through Ike Chaney's fence, across the road, into Uncle Primus's yard, past Primus's house, and I was screaming and crying. He said to me, if I did not hush he would blow my damned brains out. The crowd came running up from

the church, and following me and defendant through Primus's yard to the back of Primus's house, where the crowd got so close to us that he raised his gun and fired, cursing, and killed Will Hamilton. When he raised his gun to shoot I jerked loose and ran back to the house. He dragged me about fifty yards from where my mother was killed to where I got loose from him, I think. There was no one in the room but me at the time defendant shot mother.

My mother and defendant did not get along well as husband and wife. They have had a good deal of trouble for two or three years. Defendant whipped mother a number of times. . They fussed because defendant would cohabit with me. The first time defendant had carnal intercourse with me was when we lived on the Tyler farm. I was not then 12 years old. I told mother about it, and he whipped us both. He, after that, had carnal intercourse with me often, and would whip me and make me submit to him. And from that time on he and mother got along mighty bad. He often whipped her, and me also. I did not cohabit with him willingly; he made me do it. I was afraid of him.

On the 27th day of June, 1891, late in the evening about sundown, mother was gone to town to carry some clothes back that she had washed, and the defendant was at home, and he told me to get my clothes and go with him, and I told him I did not want to go. He got me one dress himself, and told me if I did not go with him he would beat me to death. I was scared and went, he leading the way. I cried, but he made me go anyway. He did not have hold of me. I walked right along behind him. He said that he was going to use me as his wife. When we left our house, up on the creek, we did not travel any road; we went through the woods. We had not gone far from home when night came on. We crossed the river at a bridge, and we did not stay at any one's house that night; we slept out in the woods. The next day we went on to *Cedar* Creek; we traveled the road part of the way. We met some parties that day as we went to Cedar Creek. We went to Mrs. Fullbright's; her husband was sick; there was a young man there. I did not make any complaint to them; I was afraid to. On Sunday night we stayed at Clara Massey's house. I did not make any complaint to them. On Monday we went to Eddy, and got on the train at Eddy and went on to Lorena, where we were arrested, and we were brought back to Belton and he was put in jail. I did not make any complaint to any one while we were away of the manner of his treatment to me. He told me at the jail to tell that he went away and that I said I was going to follow him. He said if I did not make that statement he would kill me. I did not follow him; he made me go.

The testimony shows that defendant had been released from jail on bond about two weeks before the killing. On the evening of the killing the defendant bought two or three pounds of buck shot at the store of the witness

Terrell, and on the same evening procured a double barreled shot gun from the house of one of his brothers. When the body of the woman was examined, after the killing, it was found that twenty-four buck shot had entered the right side of the face, head, and neck. Hamilton, the other party who was killed by defendant, was shot in the left breast with seventeen buck shot. Defendant testified in his own behalf on the trial, and his statement was that the killing of his wife was not intentional, but that at the time he fired he intended to kill one Keys, whom, he stated, had been in the habit of committing acts of adultery with his wife. His statement was that Keys had just raised the window behind his wife from the inside of her room at the time that he fired. This statement is positively disproved by the other evidence in the case, which shows that at the time, Keys was at his own house, several hundred yards away. His charge of criminal intimacy between Keys and his wife is also shown to be utterly untrue. The parties to the homicide were all negroes.

*James Boyd*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of the murder of his wife, and his penalty assessed at death. The State was permitted to prove that immediately after killing his wife, and within forty steps of her dead body, the defendant shot and killed one Will Hamilton. A bill of exceptions was reserved to the admission of this testimony, but the grounds of objection are not stated, and the bill is therefore too defective to authorize its consideration by this court.

A bill of exceptions should set forth the objections interposed to the admission of evidence, and objections not affirmatively presented will be deemed to have been waived. Bryant v. The State, 18 Texas Ct. App., 107; Gilleland v. The State, 24 Texas Ct. App., 524; Walker v. The State, 9 Texas Ct. App., 200; King v. The State, 13 Texas Ct. App., 277; Davis v. The State, 14 Texas Ct. App., 645.

But had the matter been properly presented, we do not believe any valid objection could have been urged to the competency of the evidence. It was clearly admissible as res gestæ, and was properly limited by the court in the charge given the jury.

. The second bill of exceptions is defective in the same respect. It does not inform us what grounds of objection, if any, were ever urged to the admitted evidence. The bill recites, in substance, that Jeraleen Harrison was permitted to testify that appellant and herself went " off together some two weeks before the killing of Susan Wilkerson, and were traveling together   *   *   *   until arrested and brought back to Bell County.'' This bill of exceptions is too indefinite to be considered. Bills of excep-

tion should recite facts which would enable this court to understand and know all the facts necessary to be known to determine the correctness or error of the ruling of the court to which the objection is sought to be urged.   Livar v. The State, 26 Texas Ct. App., 115;  Jacobs v. The State, 28 Texas Ct. App., 79;  Willson's Crim. Proc., secs. 2368, 2516.

Inference will not be indulged to supply omissions in a bill of exceptions.   It should be sufficiently explicit in and of itself to point out the error complained of, without recourse to presumptions or inferences. Same authorities.

Presumptions are to be indulged favorably as to the correctness of the rulings of the court, and not adversely thereto.   But if the bill had been properly presented, the evidence of this witness was clearly admissible as pertinent to the questions of malice and motive.

We have carefully considered the charge of the court and have failed to find any error in it.   If in any respect erroneous, it is in appellant's favor.   The testimony fully justifies the verdict.   The evidence disclosed that appellant and deceased, as husband and wife, had not lived together for some time, on account of his forced incestuous intercourse with her child, his step-daughter.   On the night of the homicide the daughter and mother were together at the house of a friend.   The deceased was on the gallery, sitting in a rocking chair, when appellant approached and shot her to death with a shot gun, the shot taking effect principally in her head.   He then ran to and seized his step-daughter and hurried off with her as rapidly as possible.   She was screaming and resisting him all she could, and this impeded his progress to some extent.   Several parties pursued, and as they approached him he fired upon and killed Hamilton, one of the pursuing party.

From the first shot to the latter homicide the extent of time was not exceeding two minutes, and the territory covered a distance of about forty steps.   After shooting and killing Hamilton, defendant pursued and several times snapped his gun at another one of the pursuing party, who was in rapid flight trying to escape him.

We can not concur with counsel for appellant that the testimony is insufficient to support the conviction.   We are of opinion it justifies that extreme punishment affixed by the law to the crime of murder and assessed by the jury.   The evidence manifests a cold-blooded and heartless killing, and a murder committed upon express malice.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.