14075

STATE v. BLANDEN

(180 S. E., 681)

*Messrs. Samuel T. Lanham, John D. Hamer* and *Claude A. Taylor,* for appellant.

*Messrs. Samuel R. Watt, Circuit Solicitor,* and *J. Allen Lambright, County Solicitor,* for the State.

May 30, 1935.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

The defendant, D. M. Blanden, having been indicted, tried, and convicted in the Court of General Sessions in Spartanburg County, this State, for the murder of one, Ben Sims, from the rulings, verdict, judgment, and sentence of death by electrocution and from the Court's refusal to grant

a new trial, has appealed to this Court imputing error to the trial Judge in the particulars hereinafter mentioned.

As shown by the record in the case, Ben Sims, a resident of the City of Spartanburg, was killed about midnight on the 2d or 3d of July, 1934, the killing having occurred on Spring Street in said City and County of Spartanburg. About one week later the defendant, Blanden, a negro nineteen years old, was arrested in the City of Greenville, S. C., charged with the said killing, and was brought to trial three weeks after the killing, resulting in his conviction as above stated.

On the call of the case for trial, the defendant not having secured counsel to aid him in his defense, the presiding Judge, Hon. G. B. Greene, appointed S. T. Lanham, Esquire, Claude A. Taylor, Esquire, and John D. Hamer, Esquire, able, experienced, and learned attorneys of the Spartanburg bar, as counsel for the defendant in the case to aid and assist him in conducting his defense. In this connection we desire to state that these attorneys patriotically and cheerfully accepted the appointment and performed and discharged the duties connected therewith ably and fearlessly, not only on the trial of the case in the lower Court, but also in presentation of the appeal before this Court.

On the 25th day of July, 1934, counsel for the State and counsel for the defendant having announced ready for trial, the Court proceeded with the trial of the case. Each juror was sworn on his *voir dire* and being examined no exceptions were taken. The jury being selected and sworn, the trial Judge proceeded with the trial. A number of witnesses were called by the State to testify and several witnesses were examined on behalf of the defendant, including the defendant himself.

The proof shows that Mr. Sims, a young white man, on the night that he was killed, had called upon a young lady friend, and had remained at her home from a few minutes after eight o'clock in the evening until a short time before

12 o'clock of the evening, when he left to return to his home. While walking on Spring Street on his way home, he was shot. Several persons heard the shot that was fired and heard his cries from the street where he was shot and rushed to the scene. After being shot, his body was found on the porch of one of the homes nearby, evidently in his agony having rushed from the sidewalk to this home hoping to get help, but died before help could arrive. His body was taken to a hospital and from there to a mortuary in the said city. One of the physicians who examined the body for the purpose of ascertaining the cause of death described the wounds and from this testimony it clearly appears that Mr. Sims was shot with a pistol and the bullet passed through the large vessels leading from the heart, slightly above the heart. This physician further testified in this connection that this wound was sufficient to produce the death of Mr. Sims and in his opinion did cause his death. The proof offered by the State further shows that a Negro boy or man was seen running off from the scene where the shooting occurred and one of the witnesses was close enough to observe him as he passed under a street light and noticed his dress. This witness testified that she observed that he wore dark trousers and a brown shirt. There was further testimony offered by the State to the effect that within a short distance from where this shooting occurred and just a few minutes before the shooting occurred a robbery was committed by a Negro man or boy and that this Negro who committed this robbery, by thrusting a pistol against the body of the man robbed and demanding his money, was seen running in the direction of the place where the shooting of Mr. Sims occurred. There was also testimony to the effect that immediately before the shooting of Mr. Sims at the place mentioned, some one was heard running on the sidewalk and some one coming in the opposite direction. This witness, it seems, was not positive whether both parties were running or not, but he heard some one running and he was under the impression that when the

two got close together the shooting occurred. While some of the witnesses offered by the State were not close enough to the Negro as he ran away to determine his dress, all of them were positive that he was a Negro. All of the witnesses of the State who went to the scene and saw the body testified that Mr. Sims had no weapon and was not armed in any way.

On the question of whether or not the defendant, D. M. Blanden, committed the crime charged against him and for which he was convicted we call attention to the testimony of a colored man by the name of Will Dill as to his actions following the killing of Mr. Sims, and we quote therefrom the following testimony given on direct examination:

"Q. Uncle, what is your name? A. William Dill.

"Q. Where do you live? A. Five fifty-five Young Street.

"Q. Here in the city? A. Yes, sir.

"Q. How long have you lived there? A. I been staying there about fourteen years.

"Q. Born and raised in this county? A. No, sir, I am from Anderson County.

"Q. A good county.

"Mr. Lanham: We will admit that Anderson County is a good county.

"Q. Do you know D. M. Blanden? A. Oh, yes, I know him.

"Q. The man sitting over there by Mr. Taylor? A. Yes, sir, I know him.

"Q. How long have you known him? A. I married his father's sister; when I knowed him was just before the war, when he was a baby.

"Q. On Monday before the Fourth of July of this year, did you see him? A. Yes, sir.

"Q. Where did you see him? A. He was at my house.

"Q. What time did he come to your house? A. He had been around there about a week before that, but he come

there Monday about dusk, and set around there and said he believed he would go up to the church.

"Q. Who else was at your house? A. Lewis Porter.

"Q. Anyone else? A. My wife.

"Q. What time did Blanden leave your house? A. About four or five o'clock.

"Q. Did you see him any more that night? A. No, sir, I didn't see him any more until next morning, but he come back there about one-thirty or two o'clock, but I was asleep.

"Q. Well, you can't tell that unless you saw him. When did you next see Blanden? A. About six o'clock, about sun-up.

"Q. What, if anything, did he say to you? A. He asked me what I wanted for breakfast, and I told him, 'I haven't got no money.' He said, 'I know you ain't; I got money,' and he went and got sausage and weiners for breakfast.

"Q. He came back with sausage and weiners? A. Yes, sir.

"Q. Then did you all eat breakfast? A. Yes, sir.

"Q. Then what happened? A. He asked Lewis to cut his hair.

"Q. Where did they go to cut his hair? A. Went to Dock Blanden's.

"Q. What kin is Dock to him? A. His uncle.

"Q. How long were they up at Dock's? A. Not so long before the officers came.

"Q. Where were they while over at Dock's? A. They was in the basement.

"Q. Did D. M. Blanden come back to your house? A. Yes, sir, he come back to my house and put on his coat.

"Mr. Lanham: We object to his statement about the officers coming unless he saw them.

"Q. Did you see them? A. Yes, sir.

"Q. What did D. M. Blanden do when he came back to your house? A. Come back down there and put a gun in his pocket.

"Q. What kind of gun? A. Big thirty-eight, I reckon; that is what they said.

"Mr. Lanham: We object to what he reckons.

"Q. What did he do with the gun? A. Put it in his coat and went out. I said 'Boy, you oughtn't to carry a thing like that,' and he said 'I know what I am doing', and he left and went towards the corn field and I ain't seen him until today.

"Q. He left and went towards the corn field? A. Yes, sir.

"Q. You haven't seen him until today? A. Yes, sir; that's all I know about it.

"Q. Did he show you any money before he went to the store? A. Yes, sir.

"Q. What did he say? A. I told him he ought to give his old uncle a dollar and he said he would after a while, but he got stirred up and I didn't get it."

On the cross examination this witness, Will Dill, did not make any material changes in his testimony from that given above.

The witness Lewis Porter (colored), introduced by the State, in addition to corroborating some of the testimony of the witness Dill, testified also as to other acts on the part of the defendant the night of the killing and the following morning, and because of its direct bearing on the questions involved, we quote in part his testimony from the record, as follows:

"Q. Were you at Will Dill's house on Monday night, July 2nd, I believe it was, this year? A. Yes, sir.

"Q. Who else was there? A. Four people in the house— I don't remember who they was—playing cards, five up.

"Q. Do you know D. M. Blanden? A. Yes, sir.

"Q. Was he there? A. Yes, sir.

"Q. What time did he come to Dill's house? A. He was there all day.

"Q. Was he there that night? A. Yes, sir.

"Q. What time did he leave? A. I don't know, sir; I wasn't there.

"Q. What time did you go to bed that night? A. About eleven-thirty.

"Q. Was Blanden there then? A. No, sir.

"Q. What time did he come in? A. About three-thirty or four o'clock.

"Q. Where were you? A. In bed.

"Q. What did Blanden do when he came in? A. Pulled off his shoes and lay down.

"Q. Did he pull his clothes off? A. Yes, sir.

"Q. Pulled his shoes and his clothes off? A. Yes, sir.

"Q. What time did he get up? A. About daylight.

"Q. What did he do when he got up? A. Didn't do nothing; got up and went to the store; asked Will Dill and them what they wanted to eat for breakfast.

"Q. Did he go to the store and come back? A. Yes, sir.

"Q. Then what did he do? A. He asked me to cut his hair.

"Q. Did you cut his hair? A. Yes, sir.

"Q. Where did you go to cut his hair? A. Up to his uncle's, Dock Blanden.

"Q. Why did you go up there? A. The clippers was up there.

"Q. Whereabouts in Dock's house did you go? A. Down in the basement.

"Q. While you were cutting Blanden's hair, who, if anyone, came? A. The officers come there.

"Q. Did they come into the basement? A. No, sir.

"Q. What did Blanden do while the officers were there? A. Didn't do nothing; got up and took his gun and put it under the bed.

"Q. Where did he have it? A. Under his arm.

"Q. Which arm? A. Left arm.

"Q. What kind of gun was it? A. A thirty-eight.

"Q. Do you know whether or not that is the gun? A. Yes, sir.

"Q. That is the gun. You say he got up and took it from under his arm; where did he put it? A. Laid it up under the bed.

"Q. Did you get through cutting his hair. A. All but a little bit; didn't get quite through.

"Q. Why didn't you? A. He said he had to go.

"Q. After the officers had left? A. Yes, sir.

"Q. What, if anything, did you say to him, then? A. I asked him had he got into anything.

"Q. What, if anything, did he say? A. Didn't say nothing to me then. After he went down there to Will Dill's, he told me that he and a fellow got into it, and this fellow reached for a gun, and he beat him to it and shot him.

"Q. Did he say where this took place? A. No, sir, if he did, I didn't hear it.

"Q. Did he say when it took place? A. No, sir.

"Q. What did he do then? A. Went on across the field.

"Q. What did he do with the gun? A. Left it there with me.

"Q. Didn't take it with him? A. No, sir.

"Q. What did you do with the gun? A. I left it there at Will Dill's house; put it in the trunk.

"Mr. Lanham: What did you do with the gun?

"The Witness: I put it in Will Dill's trunk.

"Q. How long did it stay there? A. Until they come and took him.

"Q. What did you do with the gun? A. His sister put it in a box and carried it over to Greenville."

The testimony of this witness regarding the dress of the defendant when he returned home that night was not altogether in agreement with the testimony of witnesses who saw him near the scene where the shooting occurred.

Afterwards Sheriff Henry of Spartanburg County, and other officers, acting on information received, sought the defendant, D. M. Blanden, and arrested him in the City of

Greenville, this State. A few minutes after his arrest, while in the chief detective's office in the City of Greenville, in the presence of Sheriff Henry and other officers, the defendant made a statement about the affair in question. In this connection it may be stated that the record discloses clearly that no threat was made against the defendant by any one at the time to cause or induce him to make an admission concerning or bearing on the crime involved or to make any other statement whatsoever. On the other hand, the defendant was informed and warned that he did not have to open his mouth unless he wanted to do so and was further warned that whatever statement was made, if any, would be used against him and, also, in effect, was warned that whatever statement he made, if any, should be the truth. In this connection Sheriff Henry testified, regarding the statement made in his presence by the defendant, Blanden, as follows:

"Q. What did he tell about the shooting? A. He said he was going down Spring Street, walking in the street, not on the sidewalk; that he met a man, and just as he got even with the man, the man said, 'Hey, Hey', and he said he reached in his pocket, made it appear he was reaching in his pocket and that 'I thought he was going to get his gun, and I shot him, and I run down South Spring Street to Hampton Avenue, to South Church Street to Caulder Avenue and on to Collins Street.' I asked him what time he got to Will Dill's, and he said between three and four o'clock. I asked him how much money he got off this boy—

"Q. What boy? A. The Skeets boy. He said he got ten dollars and ten cents.

"Q. Where did you get this gun? A. Pistol turned over to me at the Chief's office at Greenville by Mr. Brady or Hammonds one; I don't remember. I asked him—

"Q. Been in your possession ever since? A. Yes, sir. I asked Blanden at that time was that the pistol that belonged to him, was that the pistol he used, and he said it was.

"The Solicitor: We offer the pistol in evidence, may it please the Court. (Pistol above referred to introduced in evidence as Exhibit 1.)

"Q. Did the defendant, Blanden, sign a statement? A. Yes, sir.

"Q. Have you got that? A. Yes, sir.

"Q. Was that signed at that time? A. Yes, sir.

"Q. Would you read it to the jury?

"Mr. Lanham: Our objection goes all the way through, if the Court please.

"The Court: I don't know now, Mr. Solicitor; this is the first time the statement has been mentioned.

"Q. Was that taken down at the same time you had the conversation with the defendant in Greenville? A. Yes, sir.

"Q. Was that read over to him, or did he read it? A. Read over to him more than once.

"Q. Who wrote it off on the typewriter? A. I believe, Mr. Singleton.

"Q. Was it done there when this conversation was going on there or immediately afterwards? A. After the conversation this was wrote down and read to him.

"Q. Was it made freely and voluntarily on his part? A. Yes, sir.

"Q. No threats made or promises or hope of reward held out to induce him to make it? A. No, sir."

The written statement referred to, signed by the defendant following his statement in the presence of Sheriff Henry and other officers, reads as follows: "On Monday night, July 2nd, 1934, I was at the home of my uncle Will Dill, who lives at 555 Youngs Alley, in the City of Spartanburg, S. C. I left Will's home and went to a tent meeting located a block or so towards town."

At this juncture the record shows a discussion between the attorneys before the Court.

The reading of the statement of the defendant continues as follows: "The Witness (Continuing reading): I stayed

there until about 11:30 P. M., and from there I went up South Liberty Street to East Hampton Street. I followed that street to Spring Street. From there towards town up South Spring Street to West Henry and Spring Street crossing opposite Highland Court Apartment. There I met a man whom I drew my pistol and demanded his money, and he gave it to me. The amount was $10.10 in all. From there I turned around and traveled back down South Spring Street to a point just beyond Carlisle and South Spring Street crossing, where I met a man coming from the opposite direction from the way I was going. I was in the street and he was on the sidewalk and he reached as tho to get something and said 'Hep there', and when he said that I pulled my gun from my bosom and shot him one time. I saw him falling and he hollered 'Oh, Oh', but I don't know how many times. And then I broke and ran on down South Spring Street to Hampton Avenue and taken Hampton Avenue to South Church to Caulder Avenue, and on to Collins Street, and then back through Maxwell Heights and on to my Uncle Will Dill's house, where I went to bed. I do not know the hour when I reached his home."

Sheriff Henry, in the course of his testimony, testified that two or three days after the defendant was placed in the Spartanburg jail he talked to the defendant again about his confession and that this talk was made in the presence of other officers and at that time, he, the sheriff, asked the defendant if this statement (referred to above), he had made was correct, if it was true, and the defendant stated that it was true.

Sheriff Henry also testified concerning a bullet that was introduced in evidence, stating, in effect, that it was turned over to him by a certain officer and that the same had been in his possession ever since.

The witness O. L. Brady, in the course of his testimony, stated that he was present when the statement signed by the defendant, Blanden, was read over to him and that he saw

Blanden sign the statement and heard him admit that the same was correct. W. S. Bryant, one of the officers present when the defendant made his confession, in his testimony supported the testimony of Sheriff Henry regarding the confession of the defendant made in Greenville, as well as the signing of said confession. Mr. Blalock, in the course of his testimony, testified that he, with others, went down to the scene of the killing on Monday morning following the shooting during the night before; that he went for the sole purpose, along with others, of locating the bullet that killed the deceased; and that he found the bullet in the middle of the walkway at the Lawson house and identified it as the one which was introduced in evidence, stating that he had turned it over to one of the sheriff's deputies, Mr. Kirby, who was in Court. Mr. Kirby testified that he received the bullet and turned it over to Sheriff Henry, whereupon the bullet was again offered in evidence by the solicitor.

At this juncture of the trial the State closed its case and counsel for the defendant proceeded to put up evidence, introducing first the defendant himself as a witness.

In the first part of his testimony the defendant told of an injury received about six years before the shooting in question, relating how he was struck by a person with an axe handle upon the head and severely injured. It was his contention, in effect, that this injury had affected his mind. He also stated that he had not attended school much, having only gone through about the third grade and that he could not read or write.

For the purpose of a clear conception of the strength of his mind in determining whether or not he knew what he was doing at the time he shot the deceased, we quote at length from the defendant's testimony on the trial of the case, as follows:

"Q. Where were you on the second of July? A. At my uncle's house.

"Mr. Lanham: If the Court please, we wish to examine the defendant on direct examination about the hold-up, not waiving our objections to the Court's ruling in admitting it. In so examining him, we don't wish to render the other testimony competent if it is incompetent—

"The Court: Whatever effect that statement may have, you will get the benefit of it.

"Q. You went to your uncle's house; which uncle? A. Will Dill's.

"Q. That evening about what time? A. I reckon eight-thirty or nine o'clock.

"Q. From there, where did you go? A. To a little old tent meeting.

"Q. From there where did you go? A. I started on towards the station.

"Q. What for? A. I was aiming to come to Greenville.

"Q. What time was it when you got to the station? A. I didn't get to the station; I was on my way to the station.

"Q. Where did you get to? A. On West Henry and Spring Street.

"Q. Tell the jury what happened there at that time? A. I throwed a gun on a man and told him to give me his money, which he did, and I went running—

"Q. How much was it? A. $10.10.

"Q. Did you stop to count it at that time? A. No, sir.

"Q. Then this man left; which direction did he go? A. Up West Henry Street.

"Q. Did he go in a run? A. Yes, sir, he went off trotting, too; I did, too.

"Q. Were you running fast? A. Yes, sir.

"Q. Why? A. I had got afraid.

"Q. Was that or not your first hold-up? A. Yes, sir, that was the first time.

"Q. Had you ever held anybody up before that time? A. No, sir.

"Q. Immediately following that, were you afraid? A. Yes, sir.

"Q. Which direction did you go? A. I turned and went back up that street.

"Q. Were you running? A. Yes, sir.

"Q. What happened then? A. A fellow coming down the street, I was running, said 'Hep, hep' like that, and run his hand in his left side like he was going to get a gun, and I shot him.

"Q. Was he walking fast? A. Yes, sir.

"Q. Where were you? A. In the road.

"Q. Did you get off the sidewalk onto the road? A. No, sir.

"Q. Did you travel in the road all the way? A. Yes, sir.

"Q. Did you tell me, when I asked you before, talking to you in jail, that you were on the sidewalk, and when you saw this man you got off the sidewalk into the street?

"The Solicitor: We object to his cross examining his own witness.

"Mr. Lanham: I am asking him did he tell me that.

"The Solicitor: We object; this is his own witness.

"Mr. Lanham: If the Court please, we are dealing with a very peculiar witness here, who is a simpleton.

"The Solicitor: There is no testimony to show that.

"The Court: I will let him ask that question.

"Mr. Lanham: From the fact that I am dealing with a simpleton—

"The Solicitor: We object to that.

"The Court: Counsel must not make statements in the form of testimony himself. But I will let him ask that.

"Q. Did you tell me in the jail yesterday that when you met this man you were traveling on the sidewalk, and you crossed off the sidewalk into the street to keep from meeting him too closely; did you tell me that? A. Yes, sir.

"Q. Why did you say to me just now—

"The Solicitor: Is your Honor going to let them go on and on?

"The Court: I think that form is cross examination.

"Q. How far were you from the man whom you were meeting when you left the sidewalk and went into the street? A. I guess about as far as from here to the back end of the courthouse.

"Q. How closely did you approach him by the time that he spoke and said, 'Hep, there'? A. Mighty near along even with him.

"Q. Almost even with him? A. Yes, sir.

"Q. After you fired, did you see him fall? A. No, sir.

"Q. Why? A. I never stopped; I kept going as fast as I could go.

"Q. Which way did you go? A. Straight on up the street.

"Q. Up Spring Street? A. Yes, sir. I went up to East Hampton.

"Q. Then which way did you go? A. Straight across and turned down Liberty Street.

"Q. How far did you travel on Hampton Avenue? A. To Liberty Street.

"Q. Did you turn down South Church Street? A. Yes, sir.

"Q. When you got on Liberty Street, how far did you go on Liberty Street? A. Went down to Caulder Avenue and hit the pavement.

"Q. Did you see anybody on South Church Street? A. No, sir.

"Q. Did you see anybody between Hampton Avenue and Caulder? A. No, sir.

"Q. Then where did you go? A. Turned down Caulder Avenue, and from there went down Church Street.

"Q. Where did you go down Church Street to? A. Went down to Converse.

"Q. Where is that road? A. It is the next street down there; turns across there on the big highway.

"Q. Then you turned out the next one out towards the Collins home? A. Yes, sir.

"Q. Did you get into Caulder Avenue again? A. No, sir.

"Q. How did you get to the Collins place? A. Went the straight road.

"Q. Then where did you go? A. Turned next to Maxwell Heights, and went to my uncle's.

"Q. What time did you get to your uncle's? A. About three o'clock in the morning.

"Q. With whom, if anybody, did you sleep that night? A. With Lewis Porter.

"Q. Who was the first person you told about what happened? A. Nobody but Lewis Porter.

"Q. When did you tell him? A. Tuesday.

"Q. The next day? A. Yes, sir.

"Q. What time did you leave Tuesday, if you left Tuesday? A. I left out that day, Tuesday morning.

"Q. Then where did you go? A. Went around to Haynes and stayed in the woods.

"Q. Did you know that you had struck the man you fired at or not? A. No, sir; I heard him holler.

"Q. After going around Haynes and staying in the woods, where did you go next? A. Stayed there until Tuesday evening, and me and some more boys went to Greenville.

"Q. Where did you go to in Greenville? A. Caught the train out of Greenville for Greenwood.

"Q. When? A. That Thursday.

"Q. From Greenwood, where did you go? A. To Augusta.

"Q. Why did you go to Augusta? A. I was down there to get some medicine.

"Q. Did you get treatment there for a bad disease? A. Yes, sir.

"Q. From what sort of place? A. The Clinic.

"Q. Then from Augusta where did you go? A. Come back to Greenville.

"Q. When did you get back to Greenville? A. Saturday morning.

"Q. When were you arrested in Greenville? A. Monday night.

"Q. From what place were you taken when you were arrested? A. Out of my sister's home.

"Q. To what place? A. They took me to the city hall.

"Q. What happened there at the city hall? A. They questioned me, asked me did I know what they had me for, and I said no, and they said they had me for holding up and shooting a fellow.

"Q. Did they ask you to tell them all about it? A. Yes, sir.

"Q. Did they threaten you? A. Some of them told me it would be lighter on me, and it would be better to tell it, if I didn't want to sweat.

"Q. What did they mean? A. I don't know, unless it was the electric chair.

"Q. That was what you were afraid of when you told them? A. Yes, sir.

"Q. How many officers were there? A. A good crowd of officers.

"Q. How many Negroes, just one? A. Just one.

"Q. From there where did you go? A. They brought me back to the jail house.

"Q. The jail house in Spartanburg? A. Yes, sir.

"Q. Have you been there ever since? A. Yes, sir.

"Q. Were you able, or were any of your people able, to employ a lawyer to represent you in this case? A. No, sir.

"Q. Have you tried in every way you could? A. I tried; I told them to come to see me, to see if they could get me some help.

"Q. Were they able to get any? A. I. don't know whether they were or not.

"Q. Blanden, why did you kill this fine young man? A. I was afraid he was going to shoot me; he grabbed his hand on the side and I thought he was going to pull a pistol and I shot him.

"Q. Were you frightened all the time? A. Yes, sir.

"Q. Still scared from the fright you got? A. Yes, sir.

"Q. The young man you met frightened you, also? A. Yes, sir.

"Q. Did you know the man that you met at the corner of Henry and Spring? A. No, sir.

"Q. Did you know the man that you met on Spring Street, near Carlisle? A. No, sir.

"Q. State whether or not they were about the same size, about the same build? A. They was built up just alike.

"Q. Built up just alike? A. Yes, sir, as far as I could tell."

From a reading of this testimony, given on direct examination in response to questions propounded by his counsel, as well as that given on cross examination, it is clearly seen that the defendant is sufficiently intelligent to understand and know right from wrong and further at the time he killed the deceased, within a very few minutes after committing the robbery referred to and admitted by him, the defendant knew that his act was wrong and that he had a good understanding of the punishment such act or acts merited. It also appears not only from the confession made by the defendant in the City of Greenville to Sheriff Henry and the several officers, but also from his own testimony given on the trial of the case, that the defendant on the night of killing the deceased was bent on mischief and that at the time he shot the deceased he had no legal excuse for doing so. Considering the defendant's testimony alone, it may be reasonably inferred therefrom that when he came in contact with or close to the deceased he was under the impression that the deceased was the same man he had held up and robbed at the point of a pistol just a few minutes be-

fore and fired upon the deceased causing his death. However, we fail to see how any reasonable inference could be drawn from the testimony justifying or excusing the defendant's acts. According to the defendant's statement, as disclosed from his testimony, the man that he held up and robbed just a few minutes before at the point of a pistol, when released, hurried off or ran off and the defendant ran off from the scene of the robbery and was also running almost immediately afterwards when he came in contact with or close to the deceased and it was at that time that the deceased called to the defendant (that is, if the defendant's statement is to be believed), and immediately the defendant fired upon the deceased causing his death. In this connection the defendant testified, in effect, as a justification for his act, when he came in contact with the deceased, referring to the deceased, as follows: "A fellow coming down the street, I was running, said 'Hep, Hep', like that, and run his hand in his left side like he was going to get a gun, and I shot him."

The testimony clearly shows that the deceased was not armed, had no weapon upon him, but the trial Judge submitted to the jury the issue of self-defense and clearly charged the law connected therewith. The jury, by its verdict, reached the conclusion that the defendant did not establish the plea of self-defense. His Honor, the trial Judge, also submitted to the jury the question regarding the defendant's mental capacity to commit a crime and charged the law fully and clearly in connection therewith. The jury, by the verdict rendered, decided this issue against the defendant's contention, and we think properly so, under the evidence in the case.

The exceptions will be considered in the order presented.

Exception No. 1: "For that his Honor erred, it is respectfully submitted, in failing to charge the jury, as requested, that if the evidence showed the mental capacity of the defendant to be that of a child less than

fourteen years of age, then there is a legal presumption that he is incapable of committing a crime, although such presumption is rebuttable."

While the trial Judge did not charge the jury in the exact language requested by defendant's counsel, which request was presented orally during the charge, his Honor nevertheless, in our opinion, charged the law fully and clearly on this issue. In this connection we quote from his Honor's charge as follows:

"Now, Mr. Foreman and Gentlemen, under our law, where a person is under seven years of age, he is conclusively presumed not to be capable, mentally capable, of committing a crime. Where a person is between seven and fourteen years of age, he is presumed not to have the mental capacity of committing a crime, but that is a rebuttable presumption, and it may be shown that he was mentally capable of committing a crime, although he was between the age of seven and fourteen years. Where one is over the age of fourteen years, he is presumed to have the mental capacity to commit a crime, but that is also a rebuttable presumption, and in the trial of a case where the defense of mental incapacity is interposed, the law imposes upon the person setting up that defense the burden of proving it. He does not have to prove it beyond every reasonable doubt, but the law does require him to prove it by the preponderance or greater weight of the evidence; that is, if the person setting it up is over the age of fourteen years.

"Now, Mr. Foreman and Gentlemen, you are instructed that the test as to mental capacity to commit a crime is this: under the law of this State the test is mental capacity, or a want of it, sufficient to distinguish moral or legal right from moral or legal wrong, and to recognize the particular act charged as morally or legally wrong. I so charge you, Mr. Foreman and Gentlemen, in this case that, if the defendant at the bar has sufficient mental capacity to distinguish moral or legal right from moral or legal wrong, and also sufficient

mental capacity to recognize the particular act charged in this indictment as morally or legally wrong, he is mentally capable of committing a crime, or of committing the crime charged in this indictment. If, however, he does not have such mental capacity that will enable him to distinguish moral or legal right from moral or legal wrong, and to recognize or understand that the act charged in this indictment was morally or legally wrong; if he does not have the mental capacity now to do these things, then he would be mentally incapable of committing this crime; if he does have the mental capacity to do these things, then he would have the mental capacity of committing the crime as laid in this indictment."

In our opinion, the appellant has no ground for complaint as charged under this exception, and the exception is, therefore, overruled.

Exception No. 2: "In that his Honor erred, it is respectfully submitted, in allowing the prosecution to offer evidence to prove that the defendant was guilty of highway robbery, thus putting his character in issue, over the objection of the defense."

As to the allegation of error charged in this exception, in our opinion, the testimony admitted regarding the highway robbery referred to was competent for the purpose of showing the state of mind of the defendant at the time involved. The highway robbery, which the defendant in the course of his testimony admitted, was, as disclosed by the record before us, evidently committed by the defendant a very few minutes before he fired the shot that caused the death of the deceased, Mr. Sims, and the place where the shooting occurred is only a short distance from the spot where the robbery was committed. It also appears from the record, as above stated, even considering the testimony of the defendant alone, that after committing the robbery referred to, which was accomplished by thrusting a pistol against the body of the man robbed and demanding his

money on threat of taking his life, the defendant ran off from the scene of the robbery and as he ran, coming in contact with or near to the deceased, Mr. Sims, shot and killed him. It may be reasonably inferred from the record in the case that the defendant would have taken the life of the man robbed had he not handed over to the defendant his money when the defendant demanded it at the point of a pistol, and it may be further reasonably inferred from the testimony that when the defendant shot the deceased, Mr. Sims, he did it for the purpose of robbery, but was prevented from getting the money and other valuables from the person of Mr. Sims because of the fact that Mr. Sims immediately cried out in a loud voice several times which very likely caused the defendant to run off before accomplishing his purpose, or when trying to escape after committing the robbery the defendant thought Mr. Sims was in his way and shot him in order to better make his escape. In our opinion, the testimony complained of in this exception was competent for the purpose of showing the frame of mind, intent, or motive of the defendant in regard to the crime with which he was charged, also for the purpose of showing the identity of the defendant and his connection with the crime charged. We may further add in this connection that the robbery referred to was so closely connected with the taking of the life of the deceased, Mr. Sims, as to bring it within the rule of *res gestæ*.

Other crimes.

"Owing to the tendency of evidence of other crimes by the accused to prejudice him unduly in the eyes of the jury, Courts are careful to exclude it unless clearly relevant and material. * * *

"The logically correct rule governing this class of evidence seems to be that while the commission by the accused of other crimes is not in itself any evidence that he committed the one charged against him, nevertheless such evidence, like any other, is admissible whenever it is relevant

and tends to prove any material fact in the case, but that owing to its prejudicial tendency its relevancy will be subjected to closer scrutiny." 6 Ency. of Evidence, p. 675; *Farris v. People,* 129 Ill., 521, 21 N. E., 821, 4 L. R. A., 582, 16 Am. St. Rep., 283; *State v. Lapage,* 57 N. H., 245, 24 Am. Rep., 69; *People v. Ebanks,* 117 Cal., 652, 49 P., 1049, 40 L. R. A., 269.

"The difficulties between the defendant and third persons immediately preceding the homicidal act or assault, which are the cause or occasion of the fatal difficulty, form part of the *res gestæ,* but they must be immediately connected in some way with the homicide and tend to explain it." 6 Ency. of Evidence, p. 611; *Bowers v. State,* 122 Wis., 163, 99 N. W., 447; *Thomas v. State,* 44 Tex. Cr. R., 344, 72 S. W., 178; *Joyce v. Commonwealth,* 78 Va., 287.

"The acts of the defendant when forming part of the *res gestæ* are competent evidence, although they amount to independent crimes. Thus it is competent to show his assault upon or killing of a third person immediately preceding or following his fatal assault upon the deceased, and forming part of a continuous transaction." 6 Ency. of Evidence, p. 612; *Seams v. State,* 84 Ala., 410, 4 So., 521; *Horn v. State,* 102 Ala., 144, 15 So., 278; *Oliver v. State,* 38 Fla., 46, 20 So., 803; *Killins v. State,* 28 Fla., 313, 9 So., 711; *State v. Gainor,* 84 Iowa, 209, 50 N. W., 947; *Shotwell v. Commonwealth,* 65 S. W., 820, 23 Ky. Law Rep., 1649; *State v. Desroches,* 48 La. Ann., 428, 19 So., 250; *State v. Robinson,* 112 La., 939, 36 So., 811; *Alvarez v. State* (Tex. Cr. App.), 58 S. W., 1013; *Bibby v. State* (Tex. Cr. App.), 65 S. W., 193; *Powell v. State* (Tex. Cr. App.), 59 S. W., 1114; *Wilkerson v. State,* 31 Tex. Cr. R., 86, 19 S. W., 903; *Reed v. Commonwealth,* 98 Va., 817, 36 S. E., 399; *Reese v. State,* 7 Ga., 373; *Leeper v. State,* 29 Tex. App., 63, 14 S. W., 398; *State v. Vinso,* 171 Mo., 576, 71 S. W., 1034; *State v. Ramsay,* 82 Mo., 133; *State v. Sanders,* 76

Mo., 35; *Richards v. State,* 34 Tex. Cr. R., 277, 30 S. W., 229.

In connection with the views above stated, we call attention to the opinion written by Mr. Justice Jones, later Chief Justice, as the organ of the Court, in the case of *State v. Miller,* 73 S. C., 277, 53 S. E., 426, 14 Am. St. Rep., 82, and authorities therein cited. Further, it is our opinion that when the defendant, of his own free will, went upon the stand on the trial of the case and admitted the robbery referred to above and told the details of the same, relating how he ran off from that scene after committing the robbery to the place where he came in contact with the deceased, and shot the deceased, giving the details of the two deeds and showing their connection that all the testimony objected to and now complained of was made clearly competent. This exception is, therefore, overruled.

Exception No. 3: "That there was not a calm, judicial atmosphere in the trial of the case, which fact prevented the defendant's having a fair and impartial trial."

We find nothing in the record to sustain this exception and the same is, therefore, overruled.

Exception No. 4: "For that his Honor erred, it is respectfully submitted, in failing to give the jury instructions to the effect that the defendant was presumed to be innocent, and that such presumption remained with him throughout the trial, and until the State had proved him guilty beyond a reasonable doubt."

In regard to this exception, we deem it sufficient to state that a careful reading of the charge to the jury convinces us that all issues were fairly submitted and that the defendant was in no way prejudiced by what his Honor stated to the jury or by what his Honor failed to state. While his Honor, so far as the record discloses, did not in his charge use the language used in this exception, his Honor, in our opinion, used language which protected the defendant's rights. It is

not incumbent upon the trial Judge to charge in the exact language usually used by a trial Judge, just so the issues are clearly stated and the law applicable thereto made clear so that the jury can understand the duty devolved and the defendant's rights fully protected. During his Honor's charge his Honor stated several times, in clear language and in unmistakable terms, that the burden was upon the State to prove the defendant's guilt to the jury's satisfaction, beyond every reasonable doubt, and if the State failed in this, it would be the duty of the jury to find the defendant not guilty. His Honor further charged the jury that the defendant having pleaded not guilty upon his arraignment that that plea enabled the defendant to avail himself of every defense known to the law that the evidence in the case shows he is entitled to. In this connection we call attention to the fact that defendant's counsel, consisting of three able and experienced lawyers of the Spartanburg bar, did not at any time during the trial of the case request the trial Judge to charge the jury in the language used in this exception, and did not at the close of the charge call his Honor's attention to having failed to charge as the appellant now contends his Honor should have charged, notwithstanding the fact that his Honor asked counsel engaged in the case if he had overlooked anything. Evidently counsel for the defendant thought at that time that the rights of the defendant were fully protected under the charge as given, and, therefore, made no request along this line. The exception, in our opinion, is not well taken, and the same is overruled.

Exception No. 5: "In that his Honor erred, it is respectfully submitted, in failing and refusing to set aside the jury's verdict, and to grant defendant's motion for a new trial, which motion was based largely upon the grounds set out in the first four exceptions."

In our opinion, the trial Judge committed no error in refusing the motion for a new trial and the exception raising this question is overruled.

Exception No. 6: "In that it was error to authorize and permit the prosecuting attorney to stand by the defendant and counsel and advise him during his arraignment."

When the defendant was called to be arraigned, not having procured counsel to represent him, the solicitor, in the hearing and in the presence of the trial Judge, prompted the defendant to plead "not guilty" and, also, prompted him in answering the other usual questions asked of a defendant when arraigned under like indictments. Perhaps it would have been better for the trial Judge to have called upon some other attorney to prompt the defendant in answering the questions, but the record fails to disclose how the defendant was in any way prejudiced on account of the solicitor having prompted him in the particulars stated. What the solicitor said and did was in the presence of the trial Judge, who was careful all the way through the trial to protect the defendant's rights and there was absolutely nothing done which in any way prejudiced his rights. The exception is overruled.

Exception No. 7: "That the Court erred in allowing the introduction of a lead bullet, as being the bullet which caused the deceased's death, when such fact was not proved."

The testimony in the case was reasonably susceptible of the inference that the bullet introduced in evidence was the bullet fired by the defendant which caused the death of the deceased, Mr. Sims, and for whose death the defendant was indicted and was being tried. The exception is therefore overruled.

Exception No. 8: "That the Court erred in permitting the alleged 'confession' to be introduced, when it was shown that the same was obtained under circumstances when it could not be either free or voluntary, and when it was not proved by either of the two attesting witnesses."

Exception No. 9: "That his Honor erred in refusing defendant's motion to strike out the confession."

Under the well-recognized rule the written confession of the defendant, admitting the shooting involved, should have been proven by the subscribing witnesses. However, in view of what transpired in the case and the trial of the case, it cannot be said that the defendant was in any way prejudiced by the failure to prove the execution of the confession by the subscribing witnesses. The defendant made a voluntary statement to his friend, Lewis Porter, the morning following the shooting of the deceased, Mr. Sims, which was related on the trial of the case by Lewis as a witness and which tends to show that the defendant committed the crime with which he is charged and for which he was indicted and convicted. Before signing the confession in question, the defendant, after first being fully advised as to his rights, made a free and voluntary statement of the entire matter in the presence of Sheriff Henry and others, in effect, stating all matters stated in the written confession, the said written confession being signed in the presence of the same parties and at the same place, almost immediately following the oral statement made before the said parties. We may say in this connection that the record fully convinces us that no pressure whatever was brought to bear upon the defendant to cause him to make this statement and that no promises were made to him whatsoever to induce him to make the confession, either the oral or the written. Furthermore, in the course of his testimony on the trial of the case, the defendant, in effect, stated and testified to all of the matters stated and related in the said written confession.

For the foregoing reasons, the appellant is not in a position to claim or contend that he was prejudiced by the failure of the trial Judge to require the written confession referred to to be proven by the subscribing witnesses thereto, and we may add, in our opinion, that the defendant was not prejudiced by the failure of the trial Judge to require such

proof. We see no error here as charged and there was no error by the trial Judge in refusing defendant's motion to strike out the confession. These exceptions are, therefore, overruled.

After a careful consideration of the entire record in the case, it is our opinion that the defendant received a fair and impartial trial. All of the exceptions are, therefore, overruled and it is the judgment of this Court that the judgment of the lower Court be and the same is hereby affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. ACTING ASSOCIATE JUSTICES HENRY JOHNSON and C. J. RAMAGE concur.

MR. JUSTICE BONHAM (concurring in result) : The appellant was convicted in the Court of General Sessions for Spartanburg County of the murder of Mr. Sims, and sentenced to suffer death by electrocution.

When arraigned for trial, he had no counsel, and the solicitor prompted him in the answers to the questions usual in arraignment. At the request of Judge Greene, presiding, Messrs. Lanham, Taylor, and Hamer undertook the defense of the accused, and have ably and faithfully discharged the duty which was assigned to them. From the conviction and sentence, they have appealed on behalf of their unfortunate client, on exceptions to the rulings and charge of the Judge, and to the admission of certain testimony.

The main exceptions to the admission of evidence relate to the testimony offered to show that shortly before the slaying of Sims, the accused had committed a robbery of the person of another; and to the testimony offered to prove a written confession by the defendant by witnesses other than those who signed the confession as witnesses thereto.

It appears that shortly before the fatal shooting of Sims the defendant had held up and robbed one Baynard. When testimony was offered in chief by the State to prove this fact, it was objected to by defendant's counsel and was admitted over their objection.

We are of opinion that this evidence should not have been admitted. See *State v. Lyle,* 125 S. C., 406, 416, 118 S. E., 803. Standing alone, this ruling would necessitate a reversal of the judgment, but the error is cured by the fact that the defendant in his confession, and when he went upon the stand at the trial, himself detailed the facts of the robbery.

The defendant was arrested in the City of Greenville and taken by the officers to the jail. There he made a confession which was reduced to writing and signed by him, and subscribed to by certain of the officers as witnesses. At the trial, when the written confession was presented, it appeared that none of those who had signed it as witnesses were present to prove it. Defense counsel objected to its introduction for this reason. It would have been best to prove the written confession by one who signed the writing as a witness, but no harm came to this defendant from the failure to do so. Sheriff Henry of Spartanburg was present and heard the confession made by defendant, and testified that it was made without any show of force, or threats, and without any promise of immunity, or reward, and after defendant was warned that what he said would be used against him. O. L. Brady was also present and heard the confession and testified as did the sheriff. The sheriff testified further that when the defendant was in jail at Spartanburg, a few days after the confession in Greenville, he voluntarily repeated the confession to him. Moreover, in his testimony on the stand on his trial, the defendant practically admitted all that was contained in the confession.

The plea of self-defense was set up by defendant. A close inspection of the record discloses that every essential element of self-defense was lacking in the proof offered in support of the plea.

It was also urged and pleaded that the defendant has only the mental capacity of a child of fourteen years of age or less. It is charged as error that the Judge did not charge defendant's request that if the jury found the defendant has

the mind of a boy of fourteen years of age or less, the law presumes· him incapable of committing crime, although the presumption is rebuttable. It is alleged that this request was refused.

It appears that the request was an oral one presented about the close of the charge. Under the rule his Honor was not required to give it. An examination of the entire charge shows that he did, in effect, charge it, and that the jury was fully informed upon the issue. A review of the evidence satisfies this Court that the finding of the jury on this question was correct.

It is alleged as error that the trial Judge failed to charge the jury on the presumption of innocence. At the close of the charge counsel were asked by the Court if anything had been omitted, and they did not remind the Court of this omission. It was their duty to do so if they intended to complain of the omission. The jury were fully charged that before the defendant could be convicted the State must prove his guilt beyond a reasonable doubt. We find that the charge was a clear and comprehensive one which fully protected the rights of the accused.

We find nothing in the record to sustain the charge that the atmosphere of the courtroom created a condition which deprived the accused of a fair and impartial trial. It appears to us that the Court with sedulous care protected the interests of the defendant to see that he had a fair and impartial trial. He assigned to his defense three able and experienced lawyers.

It is further assigned as error that the Court permitted the solicitor to stand by the defendant and counsel and advise him during his arraignment. It is not alleged that the solicitor did not correctly and fairly counsel and advise the defendant. His counsel and advice was perfunctory and formal.

It is alleged that the Court erred in permitting the introduction of a leaden bullet, which was found shortly after the

killing upon the scene. The relevancy of this evidence was well within the discretion of the Court. That discretion was not abused.

It is the judgment of this Court that the judgment of the trial Court is affirmed.

ON PETITION FOR REHEARING

*Per curiam.*

Having carefully considered appellant's petition in connection with the entire record in the above-entitled cause, asking for a rehearing in the case, and being satisfied that the Court, in reaching its conclusion as expressed in the opinion filed in the case, did not overlook or misapprehend any matter material to the appeal, the rehearing asked for must be refused. The trial Judge fairly, clearly, and impartially submitted to the jury all issues raised by the testimony and, in our opinion, the defendant received a fair and impartial trial. It is, therefore, the judgment of this Court that the rehearing asked for by the appellant be and the same is hereby refused, the petition dismissed, and the order staying the remittitur revoked.