647 S.E.2d 144

**The STATE, Respondent,**

v.

**Christopher Frank PITTMAN, Appellant.**

**No. 26339.**

Supreme Court of South Carolina.

Heard Oct. 5, 2006.

Decide June 11, 2007.

Rehearing Denied July 18, 2007.

528

530

534

536

538

Henry Jerome Mims, of Mims Law Firm, of Greer; Arnold Anderson Vickery, Paul F. Waldner, Fred H. Shepherd, all of Vickery & Waldner, of Houston, TX; Chief Attorney Joseph L. Savitz, III, of South Carolina Commission on Indigent Defense, of Columbia; Earl Landers Vickery, of Austin, TX; and Karen Barth Menzies, of Baum Hedlund, PC, of Los Angeles, CA, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

Milton E. Hamilton, of Chester, for Guardian Ad Litem.

Chief Justice TOAL:

Christopher Pittman was arrested and charged with double homicide in connection with the deaths of his paternal grandparents. Pittman was twelve years old at the time of the incident. After a hearing, the family court waived jurisdiction allowing Pittman to be tried as an adult. The jury convicted Pittman of both murders and the trial judge sentenced Pittman to two concurrent terms of thirty years imprisonment. This appeal followed. We affirm.

### FACTUAL / PROCEDURAL BACKGROUND

In November of 2001, Christopher Pittman (Appellant) shot and killed his paternal grandparents, Joe Frank and Joy Pittman, at close range with a .410 shotgun. At the time of the incident, Appellant was twelve years old and had recently come from Florida, where he lived with his father, to live with his grandparents in Chester, South Carolina.

Shortly before moving to Chester with his grandparents, Appellant's relationship with his father became strained. Specifically, Appellant had attempted to run away from home, and also had threatened to harm himself with a knife. In response to this behavior, Appellant's father committed him to an inpatient facility. While at the facility, Appellant began taking the antidepressant Paxil. Soon after a short period of commitment, Appellant's father had him released from the

facility and agreed to allow Appellant to live with his grandparents in Chester.

Upon moving to Chester, Appellant enrolled in school and began to actively participate in church with his grandparents. His grandmother also continued Appellant's treatment for depression by taking him to a local physician to refill his Paxil prescription. The physician did not refill the Paxil prescription, but instead offered free samples and a prescription of Zoloft.[1]

On the day of the murders, the assistant principal of Appellant's school called Appellant's grandparents to the school in response to an incident which occurred the previous day on the school bus. During the incident in question, Appellant allegedly choked a second grade student. After leaving the school, Appellant and his grandparents attended choir practice. The church musician testified that she admonished Appellant for kicking her chair, at which time his grandfather took him outside to talk to him. Upon their return, the musician noted that Appellant had an angry expression.

According to Appellant, when they returned home, his grandparents locked him in his room and his grandfather warned him that he would paddle Appellant if he came out of the room. Later that night, Appellant came out of his room and his grandfather paddled him. After his grandparents went to bed, Appellant waited for ten minutes, loaded a shotgun, entered their bedroom, and shot his grandparents to death in their bed. Appellant then lit several candles and positioned them so that the house would catch on fire after he left. Appellant collected some money, weapons, and his dog, took the keys to his grandparents SUV, and drove away.

Early the next morning, two hunters found Appellant wandering around in the woods with a shotgun. Appellant told the hunters that he had been kidnapped by a black man who had shot his grandparents and set their home on fire. Appellant further told the hunters that he was able to escape when the kidnapper got the SUV stuck in the woods. He further stated that the kidnapper had shot at him before throwing the vehicle's keys and running into the woods. Upon hearing this

---

1. Both Paxil and Zoloft are part of the antidepressant classification of drugs called Selective Serotonin Reuptake Inhibitors, or SSRIs.

story, the hunters, who were also firemen with the Corinth Fire Department, took Appellant to the fire station where they alerted the police.

A search ensued for the black man who allegedly committed the crimes as Appellant suggested. During this time, Chester deputy Lucinda McKellar (McKellar) arrived to speak with Appellant. Under the impression that Appellant was a victim and possible witness to the crimes, McKellar took an oral and written statement from Appellant. In the statements, Appellant related the story that he had told the hunters.

As the search for the alleged kidnapper continued, the Chester police were also conducting an investigation of the crime scene. At some point in the afternoon, McKellar's supervisor notified her that the information from the crime scene and the search of the vehicle indicated that Appellant was a possible suspect in the crimes. At that time, McKellar took Appellant to the police station.

When they arrived at the police station, McKellar took Appellant to a conference room and told him that they needed to have an "adult conversation." Pittman sat down at the table and McKellar explained the *Miranda* rights. At that time, Appellant gave the officers a third statement in which he confessed to the murders and detailed the events of the night. McKellar wrote the statement and Appellant read and signed it.

After his confession, the police arrested Appellant for double homicide and arson. The prosecution filed a motion with the family court to waive its jurisdiction, which the family court granted. After several pretrial motions, various continuances, and delays, Appellant's trial was held from January 31, 2005 to February 15, 2005. The jury convicted Appellant on both counts of murder. The trial judge sentenced Appellant to the shortest sentence possible under the mandatory minimum sentencing guidelines—two concurrent terms of thirty years imprisonment.

After unsuccessfully arguing several post-trial motions for a new trial, Appellant filed this notice of appeal. This Court certified the appeal for review pursuant to Rule 204(b), SCACR, and issued an order expediting the appeal. Appellant raises the following issues for review:

I. Did the trial court err in failing to direct a verdict in favor of Appellant because the prosecution failed to present sufficient evidence to rebut the presumption of incapacity?

II. Was Appellant deprived of his constitutional right to a speedy trial?

III. Did the trial court err in denying Appellant's motion for a new trial based on two jurors' post-trial comments that they did not think Appellant was guilty?

IV. Did the trial court err in denying Appellant's motion for a new trial based on juror misconduct?

V. Did the family court err in waiving jurisdiction over Appellant's case?

VI. Should this Court overrule its previous decision in *State v. Corey D.*, 339 S.C. 107, 529 S.E.2d 20 (2000)?

VII. Does it violate the Eighth Amendment to the United States Constitution to sentence a twelve-year-old to a thirty-year prison term without the possibility of parole?

VIII. Did the trial court err in failing to suppress Appellant's confession?

IX. Did the trial court err in failing to charge the jury on the offenses of voluntary and involuntary manslaughter?

X. Did the trial court properly charge the jury regarding involuntary intoxication?

XI. Did the trial court err in excluding certain anecdotal information regarding the effects of Zoloft?

## Law / Analysis

### I. Presumption of Incapacity

 Appellant argues that the trial court erred in failing to grant his motion for directed verdict because the prosecution failed to present sufficient evidence during its case in chief to rebut the presumption of incapacity. Specifically, Appellant argues that lay testimony is insufficient to rebut the presumption, and suggests that expert testimony is required. We disagree.

When a motion for a directed verdict of acquittal is made in a criminal case, the trial court is concerned with the existence or non-existence of evidence, not its weight. The accused is entitled to a directed verdict when the evidence merely raises a suspicion of guilt. The accused also is entitled to a directed verdict when the State fails to present evidence on a material element of the offense charged. *However, if the State presents any evidence which reasonably tends to prove the defendants[sic] guilt, or from which the defendants[sic] guilt can be fairly and logically deduced, the case must go to the jury.* On appeal from the denial of a motion for directed verdict, this Court must view the evidence in a light most favorable to the State.

*State v. Brown,* 360 S.C. 581, 586–87, 602 S.E.2d 392, 395 (2004) (emphasis added) (internal citations omitted).

Generally, a criminal defendant is presumed to have the requisite capacity to be held responsible for the commission of a crime. *State v. Smith,* 298 S.C. 205, 208, 379 S.E.2d 287, 288 (1989) (stating that a criminal defendant is presumed sane). However, "[w]here a person is between seven and fourteen years of age, he is presumed not to have the mental capacity of committing a crime, but that is a rebuttable presumption, and it may be shown that he was mentally capable of committing a crime, although he was between the age of seven and fourteen years." *State v. Blanden,* 177 S.C. 1, 21, 180 S.E. 681, 689–90 (1935) (citing the trial court's jury charge on presumption of incapacity with approval).

Although this Court has not previously addressed whether expert testimony is required to rebut the presumption of incapacity regarding children under age fourteen, the Court has addressed similar issues relating to the capacity of adults. In *State v. Smith,* this Court held that the State could use lay testimony to rebut a criminal defendant's insanity defense. 298 S.C. at 208, 379 S.E.2d at 288 (finding expert testimony unnecessary to show sanity where the State presents sufficient lay testimony from which the jury may infer sanity). Additionally in *State v. Poindexter,* we found that the "jury was free to rely on circumstantial evidence to find [the defendant] sane even though expert testimony favored a finding that he was insane." 314 S.C. 490, 494, 431 S.E.2d 254, 256 (1993).

■ During its case in chief, the State presented several witnesses who testified about Appellant's behavior and demeanor the day after the murders. Both of the hunters who encountered Appellant in the woods testified regarding the detail and clarity of Appellant's kidnapper story. They also testified that although Appellant seemed a little scared because he was lost, Appellant was quiet and calm, and they could understand everything that he said to them.

The State also presented the testimony of several investigators. Darryl Duncan, the initial law enforcement officer to whom Appellant spoke, testified that Appellant relayed the story about the kidnapper to him and that Appellant seemed calm and was very understandable. Additionally, Lucinda McKellar, the investigator who spent the most time with Appellant, testified that Appellant told her the kidnapper story and gave her a very detailed statement about the events that occurred the previous day. During McKellar's trial testimony, the State also admitted Appellant's confession. The confession describes the murders and the arson executed to cover up the murders.

The State did not present any expert testimony as to Appellant's capacity until its case in reply. During reply, the State offered the testimony of Dr. Pamela Crawford, a court appointed examiner. Dr. Crawford testified that, in her opinion, Appellant was competent and capable of understanding the difference between right and wrong. She further testified that Appellant admitted that what he did was wrong, but maintained that his grandparents deserved it.

The State also presented the testimony of Dr. Julian Sharman, a Department of Juvenile Justice psychiatrist. Dr. Sharman testified that Appellant admitted he sat in his room and thought of a plan to get rid of his grandfather. Dr. Sharman also testified that Appellant showed no remorse for his actions, and although upset about the murders, he felt his grandparents "asked for it."

Through the testimony presented in its case in chief, the State presented evidence which demonstrated that Appellant was able to think of a story to cover up his involvement in the crime and relate the story, with little deviation, to several different people. The State also presented evidence to show

that Appellant was calm and articulate as he repeatedly retold the story. This testimony regarding the cover-up story alone was sufficient to at least create a reasonable inference that Appellant knew right from wrong and that he had done something wrong.

Although no expert testimony was presented in the prosecution's case in chief, we hold that the lay testimony of the hunters and investigators was sufficient to at least present a question for the jury as to Appellant's capacity. Given that the State's case in chief contained such voluminous testimony about Appellant's demeanor and behavior, the trial judge correctly made the finding that there was enough evidence to rebut the presumption of incapacity and send the case to the jury.

Furthermore, if we consider the evidence presented in the State's reply case, the record contains sufficient expert testimony regarding Appellant's capacity to warrant a denial of a directed verdict on this ground. Both experts examined Appellant shortly after he was arrested for the murders and were able to observe his behavior. Both experts testified that Appellant understood that his actions were wrong, but showed no remorse for his actions because he felt justified. We find this evidence more than adequate to rebut the presumption of incapacity and allow the jury to determine whether Appellant had the capacity to be held accountable for the murders of his grandparents.

Accordingly, the trial court did not err in denying Appellant's motion for a directed verdict. The State is not required to present expert testimony to rebut the presumption of incapacity.

## II. Right to a Speedy Trial

Appellant contends that he was deprived of his constitutional right to a speedy trial. We disagree.

A criminal defendant is guaranteed the right to a speedy trial. U.S. Const. amend. VI; S.C. Const. art. I, § 14. This right "is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption

of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). In determining whether a defendant has been deprived of the right to a speedy trial, the court must consider four factors: 1) length of the delay; 2) reason for the delay; 3) the defendant's assertion of the right; and 4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Accordingly, the determination that a defendant has been deprived of this right is not based on the passage of a specific period of time, but instead is analyzed in terms of the circumstances of each case, balancing the conduct of the prosecution and the defense. *Id; State v. Brazell,* 325 S.C. 65, 71, 480 S.E.2d 64, 68 (1997).

The inquiry into the length of the delay functions as a trigger mechanism for the analysis of the three other factors. *Barker,* 407 U.S. at 530, 92 S.Ct. 2182. Although there is no fixed time in which a defendant must be tried, the right to a speedy trial may be violated where the delay is arbitrary or unreasonable. *State v. Waites,* 270 S.C. 104, 108, 240 S.E.2d 651, 653 (1978). Additionally, a delay may be so lengthy as to require a finding of presumptive prejudice, and thus trigger the analysis of the other factors. *Id.*

Once the defendant has established that the delay is sufficient to warrant analysis of the other factors, the court must consider the reason for the delay. The ultimate responsibility for the trial of a criminal defendant rests with the State. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. Therefore, the court should weigh heavily against the State any intentional delays to impede the defense. *Id.* Where the reason for the delay is more neutral, the court should weigh it less heavily against the State. *Id.* A valid reason presented by the State may justify an appropriate delay. *Id.* However, the Court must also consider and weigh the defendant's contribution to the delay in determining whether the defendant's Sixth Amendment rights have been violated. *Waites,* 270 S.C. at 108, 240 S.E.2d at 653 (holding defendant's contribution to the delay of the trial militated against a finding of a violation of the right to a speedy trial).

Next, the Court must consider the actions of the defendant in asserting the right to a speedy trial. "The

defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531, 92 S.Ct. 2182. However, the defendant's failure to assert the right, although not conclusive, makes it more difficult to show that the right was violated. *Id.*

 Finally, the Court must determine whether the defendant has suffered any prejudice as a result of the delay. The United States Supreme Court has said that the most serious interest to be protected by the guarantee to a speedy trial is the possibility of impairment of the defense. "[C]onsideration of prejudice is not limited to the specifically demonstrable ... and affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett v. United States*, 505 U.S. 647, 654, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). In fact, an unduly excessive delay can be presumptively prejudicial. *Id.* at 655, 112 S.Ct. 2686. However, regardless of whether the defense is able to show particularized prejudice or the delay warrants a finding of presumptive prejudice, prejudice remains only one of the four factors to be considered in a speedy trial analysis. *Id.* at 656, 112 S.Ct. 2686.

 Appellant was arrested and charged in November of 2001, and Appellant's trial began on January 31, 2005. In the three years between Appellant's arrest and trial, several pretrial matters arose. The original defense counsel requested that Appellant be evaluated for competency in December of 2001. The month after the State served its intent to transfer Appellant's trial to General Sessions, defense counsel filed a motion for a continuance because the competency evaluations had not been completed, counsel had not seen all discovery, and counsel had not retained an independent expert. The competency evaluation was completed in February of 2002.

In February of 2003, the family court judge contacted the parties because the pre-waiver hearing process was taking too long. Both the State and the defense indicated that neither the DJJ evaluation nor the defense's independent expert evaluation were complete and more time was needed. After the completion of the DJJ evaluation, the family court held the waiver hearing, and in June of 2003 the court issued an order waiving jurisdiction.

In January and February of 2004, the defense served notices of their intention to pursue an insanity defense and an involuntary intoxication defense. The defense made another motion for a continuance in April of 2004, and subsequently filed a discovery request for the pharmaceutical company, Pfizer, to produce documents in May of 2004. After the hearing on the discovery motion, the trial judge recused himself because his wife owned Pfizer stock. This Court appointed a new trial judge in June of 2004.

In September of 2004, the defense first asserted that Appellant had been deprived of his Sixth Amendment rights. The trial court heard pretrial motions in December of 2004. Appellant's trial began on January 31, 2005.

In his brief, Appellant suggests that the delay of his trial was so lengthy that it not only meets the requisite finding of delay, but also that the delay is presumptively prejudicial. We find the delay of three years and two months between Appellant's arrest and trial is sufficient to trigger an analysis of the other factors. *See Waites,* 270 S.C. at 108, 240 S.E.2d at 653 (finding a delay of two years and four months sufficient to trigger a balancing of the other factors). However, we decline to find the delay of Appellant's trial presumptively prejudicial. *See State v. Foster,* 260 S.C. 511, 515, 197 S.E.2d 280, 281 (1973) (finding a delay of more than five years was sufficient to require analysis of the other factors without finding presumptive prejudice).

As to the reasons for the delay, Appellant argues that the State has "offered no plausible explanation whatsoever" for the delay. Appellant further argues that the State's responsibility for ensuring a speedy trial is somehow heightened by the *parens patriae* jurisdiction of the family court. This argument is misleading in light of the record before the Court. While the ultimate responsibility for timely completion of the trial rests with the State, the defense's contributions to the delay cannot be ignored.

Appellant was represented by counsel at all times during the trial process. In fact, Appellant contributed to the delay, at least to some degree, by requesting independent competency evaluations and continuances. Furthermore, Appellant

contributed to the delay because of the necessary preparation involved in the complex defenses asserted at trial.

The record does not reflect any intentional or malicious delays by the prosecution, nor does the record reflect any negligent prosecutorial behavior in connection with this case. Additionally, the delays attributable to the defense were also reasonable in light of the circumstances of this case. Although it took a long time for the case to come to trial, any delay was the result of the complexities of this case. The justifications for the delay offered by both parties in this case weigh in favor of a finding that Appellant was not deprived of his right to a speedy trial.

As to the third factor in the analysis, Appellant strongly encourages this Court to consider the family court's *parens patriae* status in weighing how and when he asserted his right to a speedy trial. Recognizing the role of the family court, we also note that Appellant was continuously represented by counsel, yet did not assert his rights until September of 2004. Up to that point, the defense was, at least to some degree, still preparing for the case. Although we find that Appellant did not waive his right to a speedy trial simply by not asserting it promptly, we also find that the responsibility for raising his speedy trial concerns do not rest solely with the family court because of its *parens patriae* status, especially where Appellant was continuously represented by counsel.

Finally, Appellant fails to meet the requirement of prejudice. Appellant relies primarily on the fact that he grew from "a 5'2" boy to a 6'1" young man" to make a showing of actual prejudice, analogizing the situation to the use of shackles on a defendant in a death penalty case. Appellant mischaracterizes any prejudice caused by his appearance. Recognizing that Appellant's appearance may have presented an obstacle for the defense, the trial court allowed the defense to display a full size cutout of Appellant depicting his actual appearance at the time of the murders. Defendants often experience changes in their appearance between arrest and trial. Sometimes those appearance differences are the result of things beyond the defendant's control, while other times defendants purposefully change their appearance. Given the quantity of

evidence presented in this case, we find that Appellant did not suffer any prejudicial effect as a result of his appearance.

Additionally, Appellant received some benefits as a result of the delay. Appellant was able to fully develop his Zoloft defense, which would not have been possible had his trial occurred soon after his arrest. Appellant was also able to secure several witnesses to attest to his behavioral improvement while at DJJ. Accordingly, we find that Appellant was not prejudiced by the delay simply because his appearance changed during the time between his arrest and trial.

Although Appellant's trial delay was very lengthy, we find the trial court did not err in finding no violation of his Sixth Amendment right to a speedy trial.

### III. Unanimous Verdict

Appellant argues that the verdict returned by the jury was not unanimous based on the post-trial comments of two jurors, and therefore the verdict violates his rights to due process and trial by jury. Specifically, Appellant argues that the verdict returned by the jury was not the jury's true verdict because the two jurors voted guilty as a result of a misunderstanding of the law. We disagree.

The trial court has broad discretion in assessing allegations of juror misconduct. *State v. Kelly*, 331 S.C. 132, 142, 502 S.E.2d 99, 104 (1998). If the juror misconduct does not affect the impartiality of the jury, it is not the type of misconduct which will affect the verdict. *Id.* The decision to grant or deny a motion based on juror misconduct is within the discretion of the trial judge. *Id.* Accordingly, the trial court's decision will not be disturbed absent an abuse of that discretion which amounts to an error of law. *Id.*

Generally, juror testimony is not allowed regarding the deliberations of the jury or internal influences. *State v. Hunter*, 320 S.C. 85, 88, 463 S.E.2d 314, 316 (1995). "[C]ourts should not intrude into the privacy of the jury room to scrutinize how jurors reached their verdict." *Id.* However, where the allegation of improper internal influence potentially affects fundamental fairness, the court may accept juror testimony to ensure due process. *State v. Galbreath*, 359 S.C. 398, 406, 597 S.E.2d 845, 849 (Ct.App.2004).

In *Galbreath,* the court of appeals held that a misunderstanding of the law does not warrant a new trial absent a denial of fundamental fairness. *Id.* Galbreath alleged that his due process rights were violated because two jurors testified they found the defendant guilty of ABHAN based on another juror's statement that the defendant would not serve jail time if convicted. *Id.* The court found that the misinformation regarding sentencing did not cause a violation of due process and did not warrant a new trial. *Id.* at 407, 597 S.E.2d at 849.

After the conclusion of Appellant's trial, the defense notified the trial court of the alleged juror misconduct. The defense alleged that one of the jurors had inappropriate conversations with both his wife and a bartender during the jury deliberations. As a result of this allegation, the trial court conducted a hearing. During the hearing, additional information was elicited from the jurors. Specifically, two jurors stated that they did not think the Appellant was guilty and that they only voted guilty as a result of information garnered from other jurors. Both jurors testified that they felt pressured to vote guilty. One juror stated that she voted guilty because another juror told her that the majority rules, and therefore everyone had to vote together to return a unanimous verdict The other stated that she voted guilty because the other jurors told her that she had to vote one way or the other.

Citing Rule 606(b), SCRE, the trial court found that the allegations concerned internal influences and that juror testimony concerning such influence was incompetent to impeach the verdict. The trial court also found that any of the offered misunderstandings of the law did not implicate due process or fundamental fairness.

We find that these misunderstandings of the law regarding the unanimity of the verdict were insufficient to warrant a new trial. The trial court was correct in its order that such instances of internal influence do not implicate fundamental fairness. Although Appellant cites several cases concerning internal influence where courts have held that fundamental fairness required the granting of a new trial, the instant case does not present similar circumstances. Most of the cases upon which Appellant relies contain an internal influence of a coercive nature (i.e. racial prejudice, gender

bias). In contrast, while the jurors in this case expressed that they felt coerced into voting guilty, no testimony was presented to actually show coercive behavior. As other courts have held, a jury's misapprehension of the law is not enough to impeach a verdict. *See Chicago, Rock Island Pacific R.R. v. Speth,* 404 F.2d 291, 295 (8th Cir.1968).

█ Additionally, even if the jurors mistakenly believed the incorrect information from another juror, they were given ample opportunity to voice those concerns before the trial court accepted the verdict. Before the deliberations, the trial court explicitly charged that a unanimous verdict was not the same as a majority verdict. Moreover, upon receiving the jury verdict, the foreman was asked if the verdict was actually what the jury decided. The trial court also polled each juror, confirming that each agreed with the verdict. *See Green v. State,* 351 S.C. 184, 196, 569 S.E.2d 318, 324 (2002) (noting that the trial court conducts a poll of the jury for the specific purpose of ensuring a unanimous verdict). The jurors' post-verdict testimonies are representative of many jury deliberations where individuals are persuaded, for whatever reason, to change their vote. As long as the reason prompting the change was not coercive or oppressive, the court should not disturb the finality of the verdict.

Accordingly, the trial court did not abuse its discretion in denying Appellant's motion for a new trial based on the two jurors' post-verdict testimonies.

## IV. Juror Misconduct

Appellant argues that the trial court erred in denying his motion for a new trial based on juror misconduct. Appellant alleges that one of the jurors had inappropriate conversations with the juror's wife and a bartender, and that these communications prejudiced the verdict. We disagree.

█ Generally, juror testimony may not be the basis for impeaching a jury verdict. *Hunter,* 320 S.C. at 88, 463 S.E.2d at 316. However, this rule is relaxed where there are allegations of external influence. *Id.* Jury misconduct that does not affect the jury's impartiality will not undermine the verdict. *State v. Harris,* 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000).

The trial court may exercise broad discretion in assessing the prejudicial effect of an allegation of juror misconduct due to an external influence. *Id.* The trial court should consider three factors when making this determination: (1) the number of jurors exposed, (2) the weight of the evidence properly before the jury, and (3) the likelihood that curative measures were effective in reducing the prejudice. *Id.* The trial court's finding will not be disturbed absent an abuse of discretion. *Id.*

Appellant alleges that there are two instances of juror misconduct involving external sources. First, Appellant alleges that one of the jurors (Juror A) inappropriately discussed the case with his wife. Additionally, Appellant alleges that Juror A participated in an inappropriate conversation with a bartender.

The trial court held a hearing regarding these allegations. During the hearing, Juror A admitted that his wife shared her point of view on the case with him, but testified that he did not express his views to her. Juror A also admitted that he had mentioned to a bartender that he was on the jury, but alleges that was the extent of the conversation.

Several jurors testified that Juror A told them his wife did not agree with him. Although one juror said that she assumed his wife felt a not guilty verdict was appropriate, none of the jurors testified that he told them his wife's point of view. Additionally, none of the jurors testified that Juror A shared his views with his wife.

During the bartender's testimony at the hearing, he testified that Juror A told him he was on the jury. The bartender also said that Juror A told him that he thought Appellant was guilty. Although there is some debate about when the conversation took place, both Juror A and the reporter who ignited the inquiry into jury misconduct stated that the conversation took place on the Monday night after deliberations had begun. The bartender, however, was less sure and unable to definitively say whether the conversation happened on Sunday or Monday.

After the hearing, the trial court found that, although juror misconduct occurred, Appellant could not make the required

showing of prejudice. Therefore, the trial court upheld the verdict.

First, we find the trial court correctly found that Appellant experienced no prejudicial effect from any comments from Juror A's wife. The record reflects that approximately four jurors, including Juror A, were exposed to knowledge of the wife's comment. Only one, Juror A, actually knew what the wife said. There is no evidence that the comment prejudicially affected Juror A's verdict, even if Juror A's wife did say she thought Appellant was not guilty.

In this case, the more critical inquiry is whether Juror A engaged in premature deliberations. Premature deliberations may affect the fundamental fairness of a trial. *State v. Aldret,* 333 S.C. 307, 312, 509 S.E.2d 811, 813 (1999).

> [Therefore], a jury should not begin discussing a case, nor deciding the issues, until all of the evidence, the argument of counsel, and the charge of the law is completed.... The human mind is constituted such that when a juror declares himself, touching any controversy, he is apt to stand by his utterances to the other jurors in defiance of evidence. A fair trial is more likely if each juror keeps his own counsel until the appropriate time for deliberation.

*Id.* at 311, 509 S.E.2d at 813.

Juror A clearly remembers the conversation with the bartender as occurring on the Monday night that jury deliberation began. The reporter's testimony supports Juror A's claim. The only person who testified differently was the bartender who was completely unsure of the day the conversation happened, but confidently testified that the conversation happened two days prior to the end of the trial. The trial ended on a Wednesday. Therefore, the record supports the trial judge's finding that the conversation, although inappropriate, did not occur prior to the beginning of deliberations. Accordingly, the trial court did not err in finding that Appellant suffered no prejudice as a result of the conversation.

For these reasons, the trial court did not abuse its discretion in denying Appellant's motion for a new trial based on juror misconduct.

### V. Family Court Waiver of Jurisdiction

Appellant argues that the family court erred in waiving jurisdiction to the court of general sessions because an analysis of the *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), factors does not justify waiver in Appellant's case. We disagree.

The family court has exclusive jurisdiction over children[2] who are accused of criminal activity. S.C.Code Ann. § 20–7–400(A)(1)(d) (2003). However, jurisdiction over a criminal matter may be transferred to the court of general sessions as provided under S.C.Code Ann. § 20–7–7605 (Supp.2005) (transfer statute). Subsection (6) of the transfer statute provides:

> Within thirty days after the filing of a petition in the family court alleging the child has committed the offense of murder or criminal sexual conduct, the person executing the petition may request in writing that the case be transferred to the court of general sessions with a view to proceeding against the child as a criminal rather than as a child coming within the purview of this article. The judge of the family court is authorized to determine this request. If the request is denied, the Appellant may appeal within five days to the circuit court. Upon the hearing of the appeal, the judge of the circuit court is vested with the discretion of exercising and asserting the jurisdiction of the court of general sessions or of relinquishing jurisdiction to the family court. If the circuit judge elects to exercise the jurisdiction of the general sessions court for trial of the case, he shall issue an order to that effect, and then the family court has no further jurisdiction in the matter.

S.C.Code Ann. § 20–7–7605(6).

■■■ Upon a motion to transfer jurisdiction, the family court must determine if it is in the best interest of both the child and the community before granting the transfer request. *State v. Kelsey*, 331 S.C. 50, 64, 502 S.E.2d 63, 70 (1998). The family court must consider eight factors, as approved by the United States Supreme Court in *Kent v. United States*, 383

---

2. The statute defines child as "a person less than seventeen years of age." However, the definition is further limited for instances involving certain felony charges. S.C.Code Ann. § 20–7–6605(1) (2003).

U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), in making this determination. The factors are:

(1) The seriousness of the alleged offense.

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner.

(3) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

(4) The prosecutive merit of the complaint.

(5) The desirability of trial and disposition of the entire offense in one court.

(6) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

(7) The record and previous history of the juvenile, including previous contacts with law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation, or prior commitments to juvenile institutions.

(8) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available.

*Id.*

The family court must provide a sufficient statement of the reasons for the transfer in its order. *State v. Avery*, 333 S.C. 284, 293, 509 S.E.2d 476, 481 (1998). "The order should be sufficient to demonstrate that the statutory requirement of full investigation has been met and that the question has received full and careful consideration by the family court." *Id.* The decision to transfer jurisdiction lies within the discretion of the family court. *Id.* at 292, 509 S.E.2d at 481. The appellate court will affirm the family court's decision absent an abuse of discretion. *Id.*

During the waiver hearing, the family court heard testimony regarding the murders. Further, the court heard testimony regarding Appellant's life and intelligence. The court also received testimony about Appellant's behavior at the Department of Juvenile Justice (DJJ) as related to the potentially rehabilitative benefits Appellant could receive from

DJJ programs. After considering this testimony, the family court found that it was appropriate to waive jurisdiction of Appellant's case.

We find that the family court properly granted the State's request to waive its jurisdiction and allow Appellant to be tried as an adult. Although the family court's order is not extremely detailed, the order sufficiently demonstrates that a full investigation occurred. Additionally, the record supports the family court's decision.

Further, Appellant's argument that the court erred in finding that he would not benefit from the rehabilitation program at DJJ is not convincing. Because we review the lower court's decision only for an abuse of discretion, this Court would have to find the family court's order wholly unsupported by the record in this regard to find error. Instead, we find that this record contains a great deal of evidence supporting the family court's decision. Looking at events occurring both before the waiver hearing and after, while there is evidence in the pre-trial motions hearings which suggests that Appellant was cooperative and capable of rehabilitation, the record also reflects that Appellant engaged in escape plans, made shanks, and caused other disruptions while in the custody of DJJ.

Accordingly, regardless of whether the Court considers just the facts in existence at the time of the waiver hearing or the additional facts which occurred after the waiver hearing, we find that sufficient evidence exists to support the satisfaction of the eight *Kent* factors. Therefore, the family court did not err in waiving its jurisdiction to the circuit court.

## VI. *Corey D.*

■ Appellant asks this Court to overrule its decision in *State v. Corey D.*, 339 S.C. 107, 529 S.E.2d 20 (2000), and find that S.C.Code Ann. § 20-7-7605(6) only allows the family court to waive jurisdiction over a juvenile if the juvenile is over the age of fourteen. Appellant offers three reasons why this Court should overrule its decision in *Corey D.*: 1) the Court misinterpreted the legislative intent of the statute; 2) recent scientific data suggests twelve-year-olds lack the capacity to be subject to the statute; and 3) the Court may avoid

any conflict between the statute and the Constitution. We decline to overrule *Corey D.*

 The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (citations omitted). All rules of statutory construction are subservient to the maxim that legislative intent must prevail if it can be reasonably discovered in the language used. *McClanahan v. Richland County Council,* 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002). A statute's language must be construed in light of the intended purpose of the statute. *Id.* Whenever possible, legislative intent should be found in the plain language of the statute itself. *Whitner v. State,* 328 S.C. 1, 6, 492 S.E.2d 777, 779 (1997). "Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Hodges,* 341 S.C. at 85, 533 S.E.2d at 581.

In *Corey D.,* this Court held that § 20–7–7605(6) permitted the family court to waive jurisdiction over a murder charge against a twelve-year-old to the court of general sessions. *Id.* Applying the rules of statutory construction in conjunction with prior case law, the Court found *"section 20–7–7605(6) authorizes transfer on the basis of the offense (murder) without regard to age,* while other subsections of 20–7–7605 authorize transfer on the basis of age and the classification of the offense." *Id.* at 113, 529 S.E.2d at 23 (emphasis added) (internal citations omitted).

Appellant argues that subsection (6)'s reference to "the child" as opposed to "a child" indicates the legislature's intention to confine the definition of "child" to the preceding subsection and not the definition of "child" as provided in the definition section of the Children's Code. *See* S.C.Code Ann. § 20–7–6605(1). Assuming the Legislature intended any meaning to be attributed to the use of the article "the," we believe it would refer to the language in the beginning of the statute—"jurisdiction over a case involving *a* child must be transferred or retained as follows"—and not subsection (5) as Appellant suggests. *See* S.C.Code Ann. § 20–7–7605. The use of "child" in the beginning of the statute clearly refers to

the definition contained in § 20–7–6605 of the Children's Code, which defines "child" as a person less than seventeen years of age.

■ Appellant's second argument regarding scientific data is not relevant to this Court's interpretation of the statute. The rules of statutory construction do not allow the Court to determine legislative intent based on scientific data.

Finally, Appellant urges this Court to overrule *Corey D.* to avoid conflict with constitutional issues.[3] This Court has held that where a statute is susceptible to *more than one construction,* the court should interpret the statute so as to avoid constitutional questions, *Brown v. County of Horry,* 308 S.C. 180, 183, 417 S.E.2d 565, 567 (1992). However, § 20–7–7605(6) has only one construction as analyzed by this Court in *Corey D.* Because we find that the statute has only one meaning, we cannot apply an alternate interpretation.

Accordingly, we decline to overrule our decision in *Corey D.*

## VII. Eighth Amendment Claim

■ Appellant argues that it violates the Eighth Amendment to the United States Constitution to sentence a twelve-year-old to a thirty-year prison term without the possibility of parole. We disagree.

■ The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." As this Court has recognized, what constitutes cruel and unusual punishment, and thus, what violates the Eighth Amendment, is determined by "evolving standards of decency that mark the progress of a maturing society." *State v. Standard,* 351 S.C. 199, 204, 569 S.E.2d 325, 328 (2002).[4]

---

3. Whether this statute suffers from a constitutional deficiency is a matter wholly separate from determining its clear intent. Although Appellant makes veiled allegations regarding the constitutionality of the statute at issue in *Corey D.,* he does not ask this Court to review either the constitutionality of *Corey D.* or the statute.

4. This proposition actually appears as a quotation in *Standard,* and is drawn from the United States Supreme Court case *Thompson v. Oklahoma,* 487 U.S. 815, 821, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988)

The United States Supreme Court has instructed that "the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.' " *Atkins*, 536 U.S. at 313, 122 S.Ct. 2242 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). The court has additionally stated that the Constitution requires the court's own judgment to be brought to bear on the issue by "asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators." *Id.* at 313, 109 S.Ct. 2934.

Appellant presents several arguments to support his position. First, Appellant argues that the portion of the brain that gives one the cognitive capacity to satisfactorily perform acts such as forming malice and waiving constitutional rights is underdeveloped in a twelve-year-old. Thus, Appellant argues that he should be given a lesser sentence than if he were an adult.

This argument is unconvincing given the nature of the criminal acts of which Appellant was convicted. Based on the evidence in the record, Appellant planned a double murder, executed an escape plan, and concocted a false story of the previous evening's events. Appellant's story was so detailed that it led law enforcement on an extensive rouse for most of the morning following his discovery. The specific factual evidence in this case stands in stark contrast to the general nature of the scientific evidence submitted by Appellant.

(citing *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). In both *Thompson* and *Trop*, the court relied on *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) for this proposition. *See Thompson*, 487 U.S. at 821, 108 S.Ct. 2687, *Trop*, 356 U.S. at 100, 78 S.Ct. 590. In *Weems*, the court stated:

Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gives it birth.
\* \* \*

The [cruel and unusual punishments clause] in the opinion of the learned commentators may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.

*Id.* at 373–78, 30 S.Ct. 544. This has become the touchstone of Eighth Amendment jurisprudence. *See Roper v. Simmons*, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *see also Atkins v. Virginia*, 536 U.S. 304, 311–312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

In *Standard*, this Court stated "[b]ased upon sentences imposed in other cases, we find lengthy sentences or sentences of life without parole imposed upon juveniles do not violate contemporary standards of decency so as to constitute cruel and unusual punishment." 351 S.C. at 205, 569 S.E.2d at 329. Although Appellant argues that he is the second youngest person in American history to be prosecuted in an adult court, that argument is not instructive for several reasons.

Primarily, the argument does not address the Eighth Amendment's concern, which is punishment; not forum of trial. Second, we note that other courts have sentenced juveniles convicted of similarly violent crimes to lengthy sentences. *See State v. Ira*, 132 N.M. 8, 43 P.3d 359, 361 (Ct.App.2002) (sentence of ninety-nine and one half years imposed where defendant, at ages fourteen to fifteen, committed ten counts of criminal sexual assault against his stepsister); *Hawkins v. Hargett*, 200 F.3d 1279, 1285 (10th Cir. 1999) (sentences totaling one hundred years (with possibility of parole) for a thirteen-year-old defendant convicted of burglary, forcible sodomy, rape, and robbery with a dangerous weapon); *State v. Green*, 348 N.C. 588, 502 S.E.2d 819, 828–33 (1998) (mandatory life sentence imposed on thirteen-year-old convicted of a first-degree sexual offense); *Avery*, 333 S.C. at 287, 509 S.E.2d at 478 (fourteen-year-old convicted of murder, armed robbery, and possession of a weapon while in commission of a violent crime given concurrent prison sentences of life, twenty-five years, and five years.); *Harris v. Wright*, 93 F.3d 581, 584 (9th Cir.1996) (fifteen-year-old defendant sentenced to life imprisonment without parole for murder); *Sanders v. State*, 281 S.C. 53, 55, 314 S.E.2d 319, 320 (1984) (thirteen-year-old who pled guilty to two counts of voluntary manslaughter received two consecutive thirty-year prison sentences).[5] Given this authority, we do not believe that evolving standards of decency in our society dictate that it is cruel and unusual to sentence a twelve-year-old convicted of double murder to a thirty-year prison term.

Finally, Appellant overlooks the "proportionality" bedrock of Eighth Amendment jurisprudence, which is equally

---

5. This entire list, excluding *Avery* and *Sanders*, was set forth in *Standard*, 351 S.C. at 205, 569 S.E.2d at 329.

important a principle as "evolving standards of decency." This case involved a brutal double murder. As the United States Supreme Court stated in *Atkins:* "it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." 536 U.S. at 311, 122 S.Ct. 2242 (quoting *Weems,* 217 U.S. at 367, 30 S.Ct. 544). To paraphrase what the Tenth Circuit stated in *Hawkins,* "[a]lthough [Appellant's] culpability may be diminished somewhat due to his age at the time of the crimes, it is arguably more than counterbalanced by the harm [Appellant] caused to his victim[s]." 200 F.3d at 1284.

■ "To establish that evolving standards of decency preclude his punishment, [Appellant] bears the 'heavy burden,' of showing that our culture and laws emphatically and well nigh universally reject it." *Harris,* 93 F.3d at 583 (citing *Stanford v. Kentucky,* 492 U.S. 361, 373, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)). Appellant has not made such a showing.

Accordingly, we hold that Appellant's sentence does not violate the Eighth Amendment to the United States Constitution.

## VIII. Admissibility of Appellant's Confession

Appellant argues the trial court erred in refusing to suppress his confession. We disagree.

■ A criminal defendant is deprived of due process if his conviction is founded, in whole or in part, upon an involuntary confession. *Jackson v. Denno,* 378 U.S. 368, 377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). This principle is best justified when viewed as part and parcel of "fundamental notions of fairness and justice in the determination of guilt or innocence which lie embedded in the feelings of the American people and are enshrined in the Due Process Clause of the Fourteenth Amendment." *Haley v. Ohio,* 332 U.S. 596, 607, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (Frankfurter, J., concurring).[6]

---

6. Stated differently, a firmly anchored principle of our society is that "important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Jackson,* 378 U.S. at 386, 84 S.Ct. 1774 (quoting *Blackburn v. Alabama,* 361 U.S. 199, 206–07, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)).

In determining whether a confession was given "voluntarily," this Court must consider the totality of the circumstances surrounding the defendant's giving the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). As the United States Supreme Court has instructed, the totality of the circumstances includes "the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (internal citations omitted). Furthermore, no one factor is determinative, but each case requires careful scrutiny of all the surrounding circumstances. *Id.*

In *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, and again in *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the United States Supreme Court reversed juveniles' convictions on the grounds that the confessions were involuntarily gathered. Though the court addressed the scrutiny applied to juveniles' confessions with quite broad language in each opinion,[7] it is firmly established that "a minor has the capacity to make a voluntary confession

---

7. For example, the court stated:

> That which would leave a man cold and unimpressed can overawe a lad in his early teens ... we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him.

*Haley*, 332 U.S. at 599–600, 68 S.Ct. 302. Similarly:

> [A juvenile] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the Appellant the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14–year–old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights.

*Gallegos*, 370 U.S. at 54–55, 82 S.Ct. 1209.

... without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." *Jenkins v. State,* 265 S.C. 295, 300, 217 S.E.2d 719, 722 (1975); see also *Vance,* 692 F.2d at 980 (quoting *Williams v. Peyton,* 404 F.2d 528, 530 (4th Cir.1968) ("Youth by itself is not a ground for holding a confession inadmissible."); *Miller v. Maryland,* 577 F.2d 1158, 1159 (4th Cir.1978); and *United States v. Miller,* 453 F.2d 634, 636 (4th Cir.1972).

When the hunters took Appellant to the fire department, the Corinth Police were the first to respond and begin a search for the kidnapper. Around 11 a.m., Lucinda McKellar, an investigator with the Chester County Sheriff's Department, arrived at the fire department. She had previous experience as a law enforcement victim's advocate. While at the fire department, McKellar took two statements from Appellant. The first statement was an oral recitation of the kidnapper story Appellant had earlier told the hunters. The second statement was a written version of the same story. Both of these statements were non-custodial because, at the time these statements were taken, Appellant was considered a victim and witness to the crime, not a suspect.

McKellar remained with Appellant after she took the statements, essentially acting as a babysitter. They had lunch together and played "go fish." Appellant also took several naps during the day. Occasionally, Appellant would initiate a conversation with McKellar. In one of the conversations, Appellant voluntarily recited a Bible verse about "burning in the fires of Hell."

Later in the afternoon, McKellar received instructions from her superior to take Appellant to the sheriff's department because the investigations indicated that Appellant was a suspect and not a victim. They arrived at the sheriff's department about 3 p.m., where McKellar took Appellant to a conference room.

At this point, McKellar told Appellant that they needed to have an "adult conversation" and Appellant sat down at the

table as McKellar began explaining Appellant's *Miranda* rights. In the middle of McKellar's explanation of these rights, another officer, Detective Scott Williams (Williams), walked into the room. McKellar then re-explained Appellant's *Miranda* rights to him while in Williams' presence. Williams then told Appellant that things were not adding up. McKellar asked Appellant about the Bible verse he mentioned earlier, however, Appellant did not respond. Williams next asked Appellant what his grandparents would think about him not being truthful. At that point, Appellant gave the officers a third statement in which he confessed to the murders and detailed the events of the night. McKellar wrote the statement and Appellant read and signed it.

After a *Jackson v. Denno* hearing, the trial court found that Appellant made a valid waiver of his rights and that the statement was voluntarily given to the investigators. The court determined that Appellant was not coerced, under duress, or influence. At the trial, the court admitted the confession and charged the jury regarding the legal standard relevant for determining the voluntariness of the confession.

We find that the instant case stands in stark contrast to the cases in federal and other state courts where courts have "set aside convictions . . . because they were based on confessions admitted under circumstances that offended the requirements of 'due process.'" *Haley*, 332 U.S. at 602, 68 S.Ct. 302. Although courts have given confessions by juveniles special scrutiny, courts generally do not find a juvenile's confession involuntary where there is no evidence of extended, intimidating questioning or some other form of coercion.[8] Appellant in effect asks this Court to adopt a rule that the United States

---

8. See *Thomas v. State*, 447 F.2d 1320, 1321–22 (4th Cir.1971) (fifteen-year-old who dropped out of school before finishing the fifth grade was taken into custody around midnight, questioned until approximately 4:30 a.m., and then again beginning at 7:30 a.m. and lasting until approximately 5:00 p.m. During this time, a team of officers rotated interrogations and also drove the defendant to various crime scenes while inquiring about his involvement in the offences.); *Gallegos*, 370 U.S. at 52, 82 S.Ct. 1209 (fourteen-year-old defendant held in police custody with no visitation for five days and questioned by a team of prosecutors for a continuous 36–hour period without sleep); *Haley*, 332 U.S. at 597–98, 68 S.Ct. 302 (fifteen-year-old defendant questioned for about five hours beginning around midnight and not informed of his right to counsel).

Supreme Court and other courts have strictly declined to adopt: that confessions of juveniles are *per se* involuntary if they are obtained without the presence of counsel, a parent, or other interested adult.[9]

In this case, Appellant has presented no evidence, other than his age, supporting his claim that his confession was involuntary. Appellant instead relies exclusively on abstract scientific data and rhetorical questions for his argument. This evidence is not probative of coercion.

Additionally, we reject the dissent's assertion that Appellant's confession cannot be said to be voluntary under the totality of the circumstances. While the dissent emphasizes Appellant's age and behavioral issues to determine that the confession was involuntary under a totality of the circumstances analysis, the dissent ignores Appellant's actions in planning a scheme and developing an elaborate story to conceal his involvement in the crime. Neither the dissent nor

---

9. Appellant only presents this argument "in effect." Instead of articulating this position, Appellant posits only that this confession was involuntary. This Court rejected a *per se* rule in *Jenkins*, 265 S.C. at 300, 217 S.E.2d at 721–22, and because we are not asked to revisit that holding today, we do not do so. For this reason the dissent's adoption of a prophylactic rule proceeds beyond the scope of the case Appellant has presented for our review.

Moreover, even had the Appellant requested such relief, such a rule is not required by the Constitution. Furthermore, the dissent's reliance on *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), to support the adoption of the prophylactic rule is misplaced. In *In re Gault*, the United States Supreme Court held that certain juvenile proceedings required the same due process protections afforded to adults in criminal proceedings. *Id.* While the Court noted that great care should be taken to assure the voluntariness of an admission by a child, the Court did not find that the standards of voluntariness or waiver for juveniles differs from the standard used for adults. *See id.* at 55, 87 S.Ct. 1428. It is for this reason that we analyze this confession under the totality of the circumstances. To safeguard Constitutional rights, the Constitutional standard ought to suffice.

Accordingly, we adhere to our previous decisions requiring only that a confession or admission of a juvenile be found voluntary under a totality of the circumstances analysis. As the dissent points out, the legislature has determined that under some circumstances a minor's rights should be restricted or that a minor should be afforded protections not extended to adults. Similarly, we think the decision of whether an interested adult need be present for a juvenile to give a voluntary confession is best left to the discretion of the legislature.

Appellant has shown any evidence that Appellant did not understand his rights or was of such low intelligence that he could not have understood his rights. In fact, scrutinizing all of the surrounding circumstances, including Appellant's behavior and actions both before and after the killings, the record indicates that Appellant was capable of voluntarily giving the statement to the authorities. The record contains no evidence that Appellant was not advised of his constitutional rights. Furthermore, the record contains no indication that Appellant was subjected to prolonged detention as a suspect, required to withstand repeated and lengthy questioning sessions, or deprived in any way of sleep or food. In fact, Appellant has presented no evidence whatsoever of coercive or improper police conduct in this investigation. The record on appeal is simply void of the type of coercive action under which courts have previously found a juvenile's statement involuntary.

Accordingly, the trial court did not err in finding that Appellant's confession was voluntarily given or in submitting the confession to the jury.

### IX. Manslaughter Charge

Appellant argues that the trial court erred in failing to charge the jury on the lesser included offenses of involuntary and voluntary manslaughter. We disagree.

A court may eliminate the offense of manslaughter where it clearly appears that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter. *State v. Burriss,* 334 S.C. 256, 264, 513 S.E.2d 104, 109 (1999). An appellate court will not reverse the trial judge's decision absent an abuse of discretion. *Clark v. Cantrell,* 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000). An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support. *Id.* The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand is an error of law. *Id.* at 390, 529 S.E.2d at 539. The law to be charged must be determined from the evidence presented at trial.

## A. Involuntary Manslaughter

Involuntary manslaughter is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Tyler*, 348 S.C. 526, 529, 560 S.E.2d 888, 889 (2002). Recklessness is a state of mind in which the actor is aware of his or her conduct, yet consciously disregards a risk which his or her conduct is creating. *See* William Shepard McAninch & W. Gaston Fairey, THE CRIMINAL LAW OF SOUTH CAROLINA 12–15 (2d ed.1989). Recklessness has also been defined as "something more than mere negligence or carelessness ... a conscious failure to exercise due care or ordinary care or a conscious indifference to the rights and safety of others or a reckless disregard thereof." *State v. Tucker*, 273 S.C. 736, 739, 259 S.E.2d 414, 415 (1979).

Appellant argues that he was entitled to an involuntary manslaughter charge because the killing of his grandparents was unintentional and reckless. In support of this argument, Appellant alleges that taking Zoloft was a "lawful activity" because he was taking medicine prescribed to him by his doctor, and while under the influence of the legally ingested Zoloft, Appellant killed his grandparents "unintentionally." Additionally, Appellant argues that, assuming he had the requisite capacity, Appellant was engaged in reckless conduct as evidenced by the fact that he pointed and shot a loaded shotgun at his grandparents.

At trial, the trial court and Appellant's attorneys discussed the logistics of an involuntary manslaughter charge extensively. After considering all the arguments and the facts of the case, the court explained its reasons for not charging involuntary manslaughter. Specifically, the trial court expressed reservation in accepting defense counsel's argument that the ingestion of Zoloft satisfied the lawful act component required for an involuntary manslaughter charge. The trial court also found there was "no evidence under the law that this conduct was reckless conduct."

We find that Appellant's conduct extends far beyond recklessness. The record reflects that after a confrontation with his grandfather, Appellant deliberately waited until his grandparents retired to bed, retrieved his shotgun, loaded the shotgun, entered their bedroom, and intentionally shot his grandparents. Although Appellant argues that the shootings were unintentional and reckless, he submitted no evidence to support that finding. Like the trial court, we find the defense's argument that the ingestion of Zoloft qualifies as a lawful act in the context of an involuntary manslaughter charge to be unconvincing.

Accordingly, we conclude that the record contains no evidence upon which a jury could find that these killings were unintentional and a result of recklessness. Therefore, the trial court did not err in failing to charge the jury regarding involuntary manslaughter.

## B. Voluntary Manslaughter

 Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation. Heat of passion alone will not suffice to reduce murder to voluntary manslaughter. Both heat of passion and sufficient legal provocation must be present at the time of the killing. The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence.

*State v. Cole*, 338 S.C. 97, 99, 525 S.E.2d 511, 513 (2000) (internal citations omitted).

 "To warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *Burriss*, 334 S.C. at 264, 513 S.E.2d at 109. In determining whether the evidence requires a charge of voluntary manslaughter, the Court views the facts in a light

most favorable to the defendant. *State v. Knoten*, 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001).

Before the case was submitted to the jury, the defense requested that if the court declined their request for an involuntary manslaughter charge, the court should charge the jury on voluntary manslaughter for a lesser included offense. Although less preferable to involuntary manslaughter, the defense pursued this claim as a result of the State's assertion that Appellant murdered his grandparents because his grandfather beat him.

## 1. Sufficient Legal Provocation

The defense argued that, assuming the confession was accurate, Appellant killed his grandparents as a result of his grandfather beating him with a paddle. Appellant's statement in the confession provides:

> I was going to get something to drink. My granddad got the paddle. I tried to get my shotgun. He hit me on my back and my butt. Then he said if I came out anymore he said he would hit me across the head with it. He had beat me back into my room. He hit me 5 or 6 times. That's what my dad used to hit me with.

The defense contends that this is sufficient legal provocation. Contrarily, the State argues that the grandfather, as Appellant's guardian, was legally entitled to paddle him and therefore there was not sufficient legal provocation. *See State v. Norris*, 253 S.C. 31, 39, 168 S.E.2d 564, 567 (1969) ("The exercise of a legal right, no matter how offensive to another, is never in law deemed a provocation sufficient to justify or mitigate an act of violence.").

This Court has previously held that an overt, threatening act or a physical encounter may constitute sufficient legal provocation. *State v. Gardner*, 219 S.C. 97, 105, 64 S.E.2d 130, 134 (1951). Notwithstanding this proposition, we decline to hold that a child has sufficient legal provocation to use deadly force against a guardian who disciplines through corporal punishment.

However, even assuming that Appellant is entitled to a finding of sufficient legal provocation as related to the death of Appellant's grandfather, Appellant has not shown any suffi-

cient legal provocation which would entitle him to the voluntary manslaughter charge as applied to the death of his grandmother. Although Appellant claimed "they beat me," there is no evidence to show that his grandmother used the paddle on him. Therefore, there could be no adequate provocation on her part. Thus, under no circumstances could the trial court have erred in not charging the jury regarding voluntary manslaughter as it relates to the death of Appellant's grandmother.[10]

## 2. Sudden Heat of Passion

The defense contends that voluntary manslaughter is an appropriate charge because the killings were the result of a "spur of the moment thing in the wake of this spanking or beating." Appellant also alleges in his brief that he was subjected to repeated beatings on the evening of the killings and was in constant fear of when the next beating might occur.[11] Conversely, the State contends that Appellant's actions signify "cool reflection," and therefore a voluntary manslaughter charge was not warranted.

"The sudden heat of passion, upon sufficient legal provocation, which mitigates a felonious killing to manslaughter, while it need not dethrone reason entirely, or shut out knowledge and volition, must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *Knoten*, 347 S.C. at 303, 555

---

10. The dissent argues that, in the absence of Appellant's confession, Appellant would be entitled to a voluntary manslaughter charge for the killing of his grandmother under the theory of transferred intent. However, the dissent fails to recognize that Appellant's entire argument for the voluntary manslaughter charge rests on the allegation that Appellant's grandfather beat him with a paddle; an allegation which is only found in the confession. Therefore, if the confession is excluded, Appellant has no basis for asserting that he had sufficient legal provocation and would not be entitled to the voluntary manslaughter charge in either case.

11. Appellant refers to the confession to support the allegation of repeated beatings. The confession states, "[h]e hit me 5 or 6 times." This statement implies that the hits occurred in one incident and not multiple incidents as Appellant's brief implies.

S.E.2d at 395. Even when a person's passion has been sufficiently aroused by a legally adequate provocation, if at the time of the killing those passions had cooled or a sufficiently reasonable time had elapsed so that the passions of the ordinary reasonable person would have cooled, the killing would be murder and not manslaughter. *Id.* At the same time, "[i]n determining whether an act which caused death was impelled by heat of passion or by malice, all the surrounding circumstances and conditions are to be taken into consideration, including previous relations and conditions connected with the tragedy, as well as those existing at the time of the killing." *Norris,* 253 S.C. at 35, 168 S.E.2d at 566.

In *State v. Cole,* 338 S.C. 97, 525 S.E.2d 511, this Court found that a period of three to five minutes constituted a sufficient cooling off period. In *Cole,* a fight occurred between the victim and the defendant at the victim's home. *Id.* Focusing on the actions of the defendant in the intervening time between the provocation and killing (as distinguished from the quantity of time that passed), the Court found that the actions taken by the defendant to go out to his car, get a knife and return to fatally stab the victim indicated "cool reflection." *Id.*

The dissent argues that the Court should not determine, as a matter of law, whether Appellant had a sufficient time in which to "cool off." Instead, the dissent would find that whether a reasonable cooling time had elapsed is a question of fact for the jury. While the law has not defined a bright-line rule for what constitutes a sufficient time for cooling off, this Court has determined that whether the defendant's actions during the intervening time between the provocation and the killing indicates the absence of sudden heat of passion is an appropriate question for the court. *See State v. Walker,* 324 S.C. 257, 261, 478 S.E.2d 280, 281–82 (1996) (finding that the defendant demonstrated cool reflection through his actions between the alleged provocation and the killing); and *State v. Byrd,* 323 S.C. 319, 322–23, 474 S.E.2d 430, 432 (1996) (holding that the defendant's actions between the alleged provocation and killing did not support a finding of sudden heat of passion).

■ According to Appellant's confession, Appellant's grandfather beat him with the paddle and sent him to his room. Appellant's grandparents then went to bed for the night. After they went to their room, Appellant waited for ten minutes, retrieved his shotgun, went back to his room to load it, and went to his grandparents' bedroom where he shot them to death. According to Appellant's confession, the period between the "beating" and the killings lasted more than ten minutes. The methodical execution of the shootings, combined with the lapse of time between the beating and shootings, clearly indicates that Appellant did not kill his grandparents in a sudden heat of passion.

Although it is possible that Appellant felt threatened at some point during the evening of the murders, there is no evidence to support the theory that Appellant's grandparents actually posed a threat to him when he fatally shot them. At the time of the murders, Appellant's grandfather was no longer beating him with the paddle. Furthermore, his grandparents were not even in the same room with Appellant when he retrieved the shotgun to shoot them; they had gone to bed for the night when the shooting occurred. Taking into consideration all the surrounding circumstances and conditions, including previous relations and conditions connected with the tragedy, as well as those in existence at the time of the killing, the evidence did not warrant a voluntary manslaughter charge.

Accordingly, the trial court did not err in failing to charge the jury on the lesser included offenses of voluntary manslaughter. Although sufficient legal provocation arguably existed as to one victim, these killings could not have occurred in the "heat of passion."

## X. Involuntary Intoxication

Appellant argues that the trial court failed to properly charge the jury regarding involuntary intoxication. We disagree.

■ South Carolina has adopted the *M' Naughten* test as the standard for determining whether a defendant's mental condition at the time of the offense rendered him criminally responsible. *State v. South,* 310 S.C. 504, 508, 427 S.E.2d 666,

669 (1993). Under this test, a defendant is considered legally insane if, at the time of the offense, he lacked the capacity to distinguish moral or legal right from wrong. *Id.* This Court has continuously utilized the *M'Naughten* test in criminal cases where issues of mental capacity are implicated. *See Id.* at 504, 427 S.E.2d at 666; *Davenport v. State,* 301 S.C. 39, 389 S.E.2d 649 (1990); *State v. Law,* 270 S.C. 664, 244 S.E.2d 302 (1978); *State v. Cannon,* 260 S.C. 537, 197 S.E.2d 678 (1973).

At trial, Appellant's counsel expressed concerns about the charge to be given to the jury regarding involuntary intoxication. The defense felt that the *M'Naughten* test did not accurately reflect the standard which should be used for involuntary intoxication defenses. Instead, the defense suggested that the trial court charge the jury based on the Model Penal Code standard of inability to conform one's conduct to the requirements of the law. After much discussion, the trial court ultimately charged the *M'Naughten* standard as required under S.C.Code Ann. § 17–24–30 (2003). However, the trial court also instructed the jury to find Appellant not guilty if they found involuntary intoxication in this case.

■ We retain the *M'Naughten* test as the correct standard for determining whether a defendant's mental condition at the time of the offense rendered him criminally responsible. The fact that other courts apply a different standard for the defense of involuntary intoxication is not dispositive. Further, Appellant has offered no other reason why this Court should adopt the Model Penal Code standard. Accordingly, the trial court properly charged the jury on this issue.

## XI. Excluded Evidence

Appellant argues the trial judge erred in excluding certain information regarding the effects of Zoloft. We disagree.

■■ The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Gaster,* 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002). An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law. *State v. McDonald,* 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000).

Generally, all relevant evidence is admissible. Rule 402, SCRE; *State v. Saltz*, 346 S.C. 114, 551 S.E.2d 240 (2001). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Relevant evidence may be excluded where its probative value is substantially outweighed by the danger of unfair prejudice. *Id.*

The trial court allowed Appellant to present a copious amount of scientific evidence regarding Zoloft and other SSRI's. The defense called prosecution expert Dr. James Ballenger. During his testimony, he conceded that SSRI's can cause hypomania or mania in some people. Additionally, Dr. David Healy testified that SSRI's could cause akathisia, emotional blunting, and mania. Dr. Ronald Maris testified that the same mechanisms that could trigger a child taking Zoloft to commit suicide could also trigger one to harm another person. Further, the defense presented testimony from a data specialist regarding adverse reaction data for SSRI manufacturers. During his testimony, the specialist discussed various reports of depression, agitation, hallucinations, and akathisia. The trial court also allowed the defense to present the anecdotal testimony of Bruce Orr regarding his negative experience with Paxil. He testified that, as a result of taking Paxil, he became irritable, impulsive, and suicidal. He further testified that the drug caused him to impulsively slam his own vehicle into his ex-wife's vehicle and house.

The trial court did not allow Appellant to submit other anecdotal evidence regarding incidents which occurred in connection with the use of Zoloft. Among other things, the court was concerned about the reliability of the anecdotal reports compared with the reliability of reports from clinical studies done in a controlled environment. The court was also concerned with the trustworthiness of the sources of the anecdotal testimony, as well as the ability of experts to establish the causal link between the Zoloft and the incidents. Despite these concerns, the trial court permitted the above expert testimony regarding Zoloft obtained from reliable methods, consistent with the South Carolina Rules of Evidence.

The record shows a conscientious decision on the part of the trial court to not admit evidence with questionable reliability where there was an abundance of other admissible evidence found to be reliable. Additionally, the trial court correctly found that the prejudicial effects outweighed the probative value of the anecdotal evidence.

Therefore, we find the trial court did not err in excluding the anecdotal evidence regarding Zoloft.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's rulings as to all issues on appeal.

MOORE, WALLER and BURNETT, JJ., concur.
PLEICONES, J., dissenting in a separate opinion.

PLEICONES, J.:

I respectfully dissent. First, I cannot agree with the majority that the infliction of corporal punishment upon a child by his parent or guardian can never constitute legal provocation so as to entitle the child who kills his abuser to a voluntary manslaughter charge, nor do I agree that evidence in this case demonstrates the dissipation of the sudden heat of passion as a matter of law. I would therefore hold the trial court committed reversible error in refusing to charge the jury on voluntary manslaughter. Second, I would adopt a prophylactic rule requiring that before police may conduct custodial interrogation of a child under the age of fourteen, he must first be permitted to consult with an interested adult. If he thereafter decides to waive his privilege against self-incrimination, I would require that the interested adult be present during the custodial interrogation.

## A. *Voluntary Manslaughter*

When reviewing the trial court's denial of a defendant's request for a voluntary manslaughter charge, the Court must view the evidence in the light most favorable to the defendant, and affirm that denial only where "there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *State v. Knoten,* 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001) *citing State v. Cole,* 338 S.C. 97, 101, 525

S.E.2d 511, 513 (2000). I simply cannot accept the majority's rule, a rule unsupported by citation of authority, that the child-victim of a beating or other abuse at the hands of a parent or guardian, who retaliates against his tormentor and kills him, is *ipso facto* guilty of murder. In this case, viewing the evidence in the light most favorable to appellant, I would hold that a jury could find evidence of legal provocation giving rise to the heat of passion in the beating administered to appellant by his grandfather.

I agree with the majority that the facts in *Cole* demonstrated cooling off as a matter of law, especially since the defendant himself admitted that "he had enough time to get his head together." I am unable, however, to agree that this angry, emotionally ill child "cooled off" as a matter of law in the ten minutes or so following the beating administered by his grandfather. In my opinion, it is for a jury and not this Court to determine whether appellant's actions in retrieving the gun, returning with it to his room, loading it, and proceeding to his grandparents' bedroom are actions demonstrating "cool reflection" and "methodical execution," or whether, perhaps, these acts are consistent with a person acting under the "sudden heat of passion."

In *State v. Goodson,* 140 S.C. 357, 138 S.E. 816 (1927) this Court surveyed the law related to "cooling off" in reversing a murder conviction because the trial court refused to charge voluntary manslaughter. In *Goodson,* the defendant's passion was incited on Tuesday afternoon and the victim shot and killed the next afternoon. The *Goodson* court cited these passages from prior decisions, with approval:

In 13 R.C. L., 790, we find:

"What constitutes 'cooling time,' as it ordinarily is termed, depends on the nature of man and the laws of the human mind, as well as on the nature and circumstances of the provocation, the extent to which the passions have been aroused, and the nature of the act causing the provocation, and therefore no precise time can be laid down by the Court as a rule of law, within which the passions must be held to have subsided and reason to have resumed its control. The question is one of reasonable time, depending on all the circumstances of the particular case; and the law has not defined, and cannot, without gross injustice, define the precise time which shall be deemed rea-

sonable, as it has with respect to notice of the dishonor of commercial paper. What constitutes reasonable time in a particular case is ordinarily a question of fact for the jury; and the court cannot take it from the jury by assuming to decide it as a question of law."

In *State v. McCants,* 1 Speers, 390, the Court, in speaking of what is reasonable time for cooling, said:

"The standard of what is reasonable, is ordinary human nature; to be applied by the Court, if all the facts and circumstances be found by a special verdict, or to be applied by the jury in giving a general verdict. As to the reasonable time in which cooling should ensue after provocation, no precise rule can be given."

In the same case, at page 391, we find:

"In all cases where the time of cooling may be considered, whether the time be regarded as evidence of the fact of cooling, or as constituting, of itself, when reasonable, legal deliberation, the whole circumstances are to be taken into the estimate in determining whether the time be reasonable. The nature of the provocation, the prisoner's physical and mental constitution, his condition in life and peculiar situation at the time of the affair, his education and habits (not of themselves voluntary preparations for crime), his conduct, manner and conversation throughout the transaction; in a word, all pertinent circumstances may be considered, and the time in which an ordinary man, in like circumstances, would have cooled, is a reasonable time."

*State v. Goodson,* 140 S.C. at 361–2, 138 S.E. at 817–8.

In my opinion, the trial court erred in declining to charge voluntary manslaughter. *State v. Goodson, supra.* I would therefore reverse appellant's convictions [12] and remand for a new trial. Since the issue of the admissibility of his statement will most likely arise on retrial, I address the merits of that issue as well.

---

12. While the grandfather's actions supplied the legal provocation, it is unclear from the record, in the absence of appellant's confession, whether he intended to shoot his grandmother or whether she was the unintended victim of appellant's "manslaughter intent" state of mind directed at his grandfather. Since intent is unclear, I would reverse and remand appellant's conviction for the murder of his grandmother as well as his conviction for the killing of his grandfather. *E.g., State v.*

## B. *Admission of Appellant's Custodial Statement*

The majority declines to adopt a *per se* rule that a juvenile's confession is inadmissible unless obtained in "the presence of counsel, a parent, or other interested adult," choosing instead to adhere to the "totality of the circumstances" test for evaluating the voluntariness of a juvenile's confession. In my opinion, appellant's confession does not pass the totality test. Moreover, I would adopt the following prophylactic rule:

> Before a child under the age of fourteen may waive his privilege against self-incrimination and submit to custodial interrogation, he must have the opportunity to consult with an interested adult and, if the child waives the privilege, to have that adult present throughout the interrogation. An interested adult means a parent or guardian whose interests are not adverse to that of the child's, or an attorney.

While such a rule is not required *verbatimet litteration* by the Constitution, in my opinion it will best serve to protect the interests of society, law enforcement, and the minor.[13]

As the Supreme Court explained in 1967,

> The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not mere fruits of fear or coercion, but are reliable expressions of the truth. The roots of the privilege are, however, far deeper. They tap the basic stream of religious and political principle because the privilege reflects the limits of the individual's atonement to the state and—in a philosophical sense—insists upon the equality of the individual and the state. In other words, the privilege has a broader and deeper thrust than the rule which prevents the use of confessions which are the product of coercion because coercion is thought to carry with it the danger of unreliability. One of its purposes is to prevent the state, whether by

---

*Gandy,* 283 S.C. 571, 324 S.E.2d 65 (1984) *overruled on other grounds Casey v. State,* 305 S.C. 445, 409 S.E.2d 391 (1991).

**13.** I believe such a prophylactic rule, much like that established by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), will ensure that waivers by children under the age of fourteen are voluntary within the meaning of the 5th Amendment.

force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the state in securing his conviction.

*In re Gault,* 387 U.S. 1, 47, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

Moreover, the Gault Court, while not requiring the "interested adult" rule in the context of juvenile adjudication [14] went on to hold:

We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*Id.* at 55, 138 S.E. 816.

I would apply the "interested adult" rule only to children under fourteen years of age. At common law, a child under fourteen is *prima facie doli incapax. State v. Toney,* 15 S.C. 409 (1881). The presumption that these children are incapable of committing a crime is founded "[o]ut of tenderness to infants—the ease with which they may be misled—their want of foresight and their wayward disposition. . . ." *Id.* at 414. Even at fifteen, such "a mere child [is] an easy victim of the law . . . 15 is a tender and difficult age for a boy . . . [who] cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

---

14. The present case, of course, involves the trial of a juvenile as an adult.

I do not doubt that a child of between the ages of seven and fourteen may be capable of understanding the difference between right and wrong, and thus capable of committing a criminal offense. The ability to distinguish right from wrong is not, in my opinion, determinative whether the child is capable of a knowing, intelligent, and voluntary waiver of his constitutional rights. South Carolina statutes, as well as court rules, are replete with examples where a distinction is drawn between children under fourteen and those fourteen or older. *See, e.g.,* S.C.Code Ann. §§ 20–7–140 *et seq.* (minors fourteen or over may petition for custodial payments or an accounting, or designate a successor custodian under the "South Carolina Uniform Gifts to Minors Act"); §§ 62–5–410; –407 (minors aged fourteen years old and above may be considered for certain probate court appointments); § 20–7–1690(A)(1) (children aged fourteen and up must consent to their adoption); § 23–35–120(1) (legally purchase fireworks without a parent); Rule 4(d)(2), SCRCP (child under fourteen cannot be directly served with process); Rule 17(d)(3), (5) (child under fourteen, like an incompetent person, cannot petition for the appointment of his own guardian ad litem); *cf.* S.C. Const. art. III, § 34 (unmarried woman under fourteen cannot consent to sexual intercourse).

The law presumes that minors are incapable of making certain decisions which carry with them serious legal consequences. *See* statutes and rule cited above; *see also* § 20–1–100 (persons under sixteen "not capable of entering into a valid marriage"); § 20–7–250 (in general, contracts made during infancy must be ratified in unity after "full age" to be enforceable). At issue here is the minor's decision whether to "assist the state in securing his convictions," the consequences of which are at least as far reaching as the decision to marry or to enter a contract. In my opinion, it best serves the interests of society to require that minors, under the age of fourteen, whom the law in all other respects treats as it does incompetent adults, consult with an interested adult before waiving their privilege against self-incrimination.

Even if we do not adopt this rule today, it is my opinion that appellant's confession cannot be said to be voluntary under the totality of the circumstances. The undisputed facts demonstrate that appellant, aged twelve, had received inpatient

treatment for depression before coming to live with his grandparents. His prescription medicine had been changed, and there was evidence that his condition was deteriorating. On the day before the killings, appellant assaulted a young child, and on the day itself, appellant had been taken from school by his grandparents. An individual observed appellant that evening demonstrating bad behavior and an angry attitude. Later that evening appellant was "paddled" by his grandfather: ten minutes later appellant shot and killed both his grandparents.

Appellant then set a fire, took money, weapons, and his dog and left in his grandparents' vehicle. The next morning appellant was found in the woods. During the day, appellant was befriended by Deputy McKellar and they spent the next four hours talking, eating and playing cards. Later that afternoon, about 3 p.m., McKellar took appellant to the police station after his status was changed from victim to suspect. At the station McKellar told appellant it was time for an adult conversation and explained to appellant his Miranda rights. Another officer entered the room, apparently assuming the role of the "bad cop." McKellar asked appellant about a bible verse he had mentioned earlier, and the other officer asked appellant what his grandparents would think about his lack of truthfulness. At this point, appellant confessed.

Myriad factors are to be considered when reviewing the totality of circumstances attendant upon a minor's waiver of his privilege against self-incrimination. While age is certainly an important factor, it alone is not determinative. *In re Williams*, 265 S.C. 295, 217 S.E.2d 719 (1975). However, according to one commentator, "Invariably, the cases that hold that age alone is not determinative of the effectiveness of the waiver [in the absence of an interested adult] have involved minors who were fourteen years of age or older, and most often sixteen or seventeen." Davis, *Rights of Juveniles 2d* 175 (2006). Other factors which must be considered in determining the validity of a minor's waiver include "intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." *In re Williams*, 265 S.C. at 300, 217 S.E.2d at 722(internal citations omitted).

Here, a twelve year old emotionally disturbed child with no prior experience with the justice system waived his rights

approximately eighteen hours after killing his grandparents, having spent the night in the woods, the midday in the company of a sympathetic officer,[15] napping occasionally, playing cards, eating, and talking before being taken to the police station where the atmosphere changed from compassionate care to interrogation. Viewing the totality of these circumstances "with the greatest care,"[16] I am unconvinced that appellant's decision to waive his privilege was knowing, voluntary, and intelligent. Upon retrial, I would hold the statement inadmissible because it was obtained without the advice and consent of an interested adult, and because under the totality of the circumstances appellant's waiver does not pass constitutional muster.

I would reverse appellant's convictions and sentences, and remand for further proceedings.

---

15. I do not suggest that Deputy McKellar did anything improper.

16. *In re Gault, supra* at 55, 87 S.Ct. 1428.